OPINION OF THE COURT
Sgroi, J.
“[Dogs] are such agreeable friends — they ask no questions, they pass no criticisms” (George Eliot, Scenes of Clerical Life [1857]), but do they belong in the courtroom? On this appeal, we examine the question of whether the courts of this state should permit the presence of a therapeutic “comfort dog” in a trial setting when the court determines that the animal may provide emotional support for a testifying crime victim. We conclude that this question should be answered in the affirmative.
Background/Pretrial Motion
Pursuant to a Dutchess County indictment dated December 16, 2010, the defendant was accused of committing the crimes of predatory sexual assault against a child (Penal Law § 130.96), a class A-II felony, and endangering the welfare of a child (Penal Law § 260.10), a class A misdemeanor. Specifically, it was alleged that between the summer of 2006 and November 2010, the defendant engaged in multiple acts of sexual misconduct, including frequent sexual intercourse, with his daughter (hereinafter J), who was under the age of 18 years, having been born *256 in 1995. It was further alleged that, as a result of the defendant’s misconduct, the victim twice became pregnant, and that on both occasions the defendant arranged for her to undergo an abortion.
By notice of motion dated May 12, 2011, the People sought to allow “Rose,” a golden retriever therapy assistance animal, or “comfort dog,” to accompany J on the witness stand while she testified at the defendant’s trial. In support of the motion, the People argued that Rose had proved useful during J’s interviews and therapy sessions because the presence of the dog made J more at ease and allowed her to become “more verbal.” More importantly, J had expressed anxiety about having to testify and be cross-examined at trial regarding the details of the alleged abuse, and J’s therapist indicated that Rose’s presence would help to alleviate the apprehension, as well as the psychological and emotional trauma that such testimony might engender.
The People acknowledged that there was “no case law or statutory authority in New York for specifically allowing an assistance dog to accompany a witness to the stand, however, there was precedent for allowing a child witness to have a comfort item (e.g., a teddy bear) while testifying.” The People argued that J qualified as a “special witness” under the Criminal Procedure Law, and that support for allowing Rose to be present with J while she testified could be found in Executive Law § 642-a, which allows for a “person supportive of [a] ‘special witness’ ” to be “present and accessible” during the testimony of the witness.
In opposition, the defendant argued, inter alia, that Rose’s presence would “clearly prejudice the jury against” him. More specifically, the defendant maintained that the dog’s presence would convey to the jury that the witness is under stress as a result of testifying about the subject events, and that her stress resulted from “telling the truth.” The defendant further argued that the jury would be more “sympathetic” to J if Rose were present, and that cases involving therapy dogs “overwhelmingly” involve preteen witnesses, whereas, at the time of trial, J was 15 years old. Thus, the defendant concluded that J should not be afforded the requested accommodation when she testified at trial.
The County Court scheduled a hearing on the issue of whether Rose should be permitted to accompany J and stay beside her as she testified. However, the hearing was not a scientific-evidence hearing scheduled in accordance with the dictates of Frye v *257 United States (293 F 1013 [DC Cir 1923]) and, notably, the defendant never requested a Frye hearing.
At the hearing, testimony was adduced from Lori Stella, an employee of the Dutchess County Office of Child and Family Services, who stated that her title was “licensed Master of Social Work,” and that she had four years of experience working with children in the foster-care system. Stella explained that J spent the first 10 years of her life living in Guatemala, where she was raised by her maternal grandparents, that she then came to the United States at the defendant’s request, that the abuse began soon thereafter, and that J had virtually no contact with her mother. Stella had been working with J since August 2010, and had seen her professionally about once per week since that time. According to Stella, J had been diagnosed by a psychiatrist with post-traumatic stress disorder as a result of the sexual abuse perpetrated upon her by the defendant. Stella also stated that J was “unable to express her emotions”; that she did not want to discuss the abuse; and that she had trouble sleeping at night. Stella observed that, during J’s therapy sessions, “you can visibly see the anxiety; [J] will normally be pulling at her sleeves and not able to sit still [or] make eye contact.” Stella further testified that she had utilized Rose during at least three 30-to-45-minute therapy sessions with J, and that the use of the dog was recommended by Stella’s supervisor. Stella stated that when Rose was present, “J is a lot more verbal, just in general, about her day, her comings and goings.” When Stella discussed the fact that J was to testify at trial, and would then see and confront the defendant again after having been away from him for over one year, J “started to experience some anxiety.” In particular, Stella explained that J was worried and did not feel safe because of “the way that her family members have made her feel about this situation,” as if she were a scapegoat. However, when Rose “placed her head on J’s lap, and J began to pet her, [J] was better able to talk about [how] she felt and how she would feel safer if Rose was present with her in the courtroom.”
Stella also testified that having J testify in open court about the abuse would be tantamount to “retraumatizing her and causing her to experience post-traumatic stress disorder symptoms and possibly increase those symptoms.” In fact, Stella noted that, “even in therapy when J is very upset about something, she completely shuts down.” In Stella’s opinion, Rose’s presence with J while she testified “would have a sooth *258 ing impact on [J]”; would allow J to “be able to better express herself verbally”; and would “decrease her levels of physiological stress.” Stella stated that it is easier for J to talk about matters “[w]hen she maintains her composure.”
At the conclusion of Stella’s examination and cross-examination, the People argued that Rose should be permitted to accompany J to the stand, explaining that “if Rose senses J’s anxiety [she] will [simply] sit up and put her head on J’s lap.” Indeed, Rose had been trained since the age of eight weeks “to sense stress and anxiety and act in such a way to help reduce that” by raising herself up and offering herself to the person to be petted. The People also noted that the court could provide instructions to the jury with regard to the dog. The defendant requested that the court deny the People’s motion and instead allow Stella to be present “anywhere in the courtroom, except . . . directly behind [the witness] at the stand.”
The County Court then observed that if Stella were to sit in the back of the courtroom, J would not see her, but that if Stella were to sit near the front, “there’s a far greater chance that a person can be deemed to be influencing the child’s testimony than the dog, who can’t speak, who can’t speak to the child, [and] the child can’t speak back to the dog.” The court determined that Stella’s presence near J could lead the witness “to inadvertently look towards her therapist for support and that could be deemed by the jury as looking for answers, and be misinterpreted that she’s afraid to answer without checking with her therapist first, or that the therapist is influencing what she’s about to say.” The court found that “there’s a far lesser chance of that happening with the dog, which has been recognized in the case law.”
The County Court’s Decision
In an order dated June 1, 2011, the County Court granted the People’s motion. The court concluded, inter alia, that Executive Law § 642-a, “which establishes guidelines for the ‘fair treatment of child victims as witnesses [,]’ is applicable to the 15 year-old victim in this case” since the intent of that law “is to protect children under 16 years of age who are victimized by crime” (emphasis added). The court also found that J’s trial testimony was “likely to cause severe emotional, mental and psychological stress,” which “necessitates the consideration of procedures to protect [her] mental and emotional well-being while testifying.” However, the court also stated that it did “not take the defendant’s argument lightly that to permit Rose to ac *259 company the victim while she is testifying may be prejudicial.” Accordingly, although the court granted the People’s request to allow the comfort dog to accompany J during her testimony, pursuant to Executive Law § 642-a (4), it noted that “[w]ith an appropriately fashioned instruction to the jury, any possible prejudice will be minimized, if not eliminated,” and “in this regard [defense counsel is invited] to prepare proposed limiting and curative instructions [which], if appropriate . . . will be adopted by the court.”
Trial/Sentence/Motion to Vacate Conviction
On June 2, 2011, the defendant proceeded to a jury trial before the County Court. Before J testified, the court instructed the jury as follows:
“Ladies and gentlemen, the next witness is [J] who is obviously sitting in the jury box. As you might recall, I previously spoke to you about the companion animal that’s with her. As I indicated before and I reiterate to you now, during the testimony of [J] she will be accompanied by a companion dog. The decision to allow this was one the court made and you may not speculate in any way as to why that decision was made. You must not draw any inference either favorably or negatively from either side because of the dog’s presence. You must not permit sympathy for any party to enter into your considerations as you listen to this testimony, and this is especially so with an outside factor such as a companion dog permitted to be present in the courtroom. Each witness’s testimony must be evaluated based upon the instructions I give you during my charge and on nothing more.”
The trial transcript reveals no other mention of Rose’s presence during J’s testimony or at any other point during the rest of the trial. The County Court repeated the above comments regarding the presence of the dog in its instructions to the jury, given prior to deliberation.
At the conclusion of the trial, the jury returned a verdict convicting the defendant of predatory sexual assault against a child and endangering the welfare of a child. On July 28, 2011, the defendant was sentenced to an indeterminate term of imprisonment of 25 years to life on his conviction of the count of predatory sexual assault against a child and a definite sentence of one year of incarceration on his conviction of the *260 count of endangering the welfare of a child, to run concurrently with each other.
The defendant moved, pursuant to CPL 330.30 (1), to set aside the verdict, arguing, inter alia, that Rose’s presence during J’s testimony deprived him of a fair trial, and violated his right to confront and cross-examine witnesses against him. The defendant also argued, among other things, that Rose’s presence in the courtroom was not authorized under the Executive Law, and that the court should have conducted a Frye hearing on the matter.
In an order dated July 27, 2011, the County Court denied the motion to set aside the verdict, holding that the defendant “had provided no authoritative proof that [the court’s decision regarding Rose’s presence] requires reversal as a matter of law as mandated by CPL § 330.30 (1) [and that] it is particularly noteworthy that defendant cannot demonstrate actual prejudice.” The court also noted that it had offered the defense an opportunity to submit proposed jury charges with regard to the dog’s presence at trial, but that the defense declined to submit such proposed charges.
Appellate Arguments
On appeal, the defendant repeats many of the arguments that he made in support of his motion to set aside the verdict, and he also, inter alia, challenges the County Court’s conclusion that CPL 60.42 (the so-called Rape Shield Law) barred him from presenting certain evidence in his defense. With respect to the comfort-dog issue, the defendant argues that Executive Law § 642-a does not specifically permit the presence of a comfort dog at a criminal trial; that the County Court’s interpretation of the statute so as to permit such presence improperly invaded the domain of the legislature; and that the dog’s presence violated the defendant’s due process right to a fair trial and impaired his right to confront witnesses against him. The defendant also contends, for the first time on appeal, that Executive Law § 642-a is unconstitutional; that the People committed prosecutorial misconduct because they were allegedly instrumental in providing the comfort dog for J’s use; and that the court was required to make a finding of necessity before allowing such accommodation.
Discussion
Executive Law § 642-a
The issue of whether a therapeutic comfort dog may be employed at trial is one of first impression in this state. While *261 the issue has been addressed in other jurisdictions, New York courts have not yet had the occasion to analyze this development. It is also true, as the People noted in their moving papers before the County Court, that there is no New York statute which specifically states that comfort dogs are permissible in a trial setting. However, the legislature has generally addressed the treatment of crime victims, and it has endeavored to ensure that those who are victimized by criminal acts are treated fairly during the subsequent judicial process. To that end, in 1984, New York passed article 23 of the Executive Law, entitled “Fair Treatment Standards for Crime Victims.” In 1986, the legislature added a new section to this article, section 642-a, entitled “Fair treatment of child victims as witnesses.” The purpose of the legislation was to address the emotional stress which a child victim might endure as a result of his or her necessary involvement with criminal proceedings. As explained above, the statute was relied upon by the People in support of their motion and was found to be applicable herein by the County Court. In our opinion, the County Court’s conclusion in this regard was correct and, thus, we reject the defendant’s first argument, which was that there is no statutory authority in New York permitting a trial witness to be accompanied by a therapy assistance animal. Specifically, we conclude that Executive Law § 642-a applies in this case.
Executive Law § 642-a states, in pertinent part:
“To the extent permitted by law, . . . the courts shall comply with the following guidelines in their treatment of child victims: . . .
“4. The judge presiding should be sensitive to the psychological and emotional stress a child witness may undergo when testifying.
“5. In accordance with the provisions of article sixty-five of the criminal procedure law, when appropriate, a child witness as defined in subdivision one of section 65.00 of such law should be permitted to testify via live, two-way closed circuit television.
“6. In accordance with the provisions of section 190.32 of the criminal procedure law, a person supportive of the ‘child witness’ or ‘special witness’ as defined in such section should be permitted to be present and accessible to a child witness at all times *262 during his testimony, although the person supportive of the child witness should not be permitted to influence the child’s testimony.”
CPL 190.32 (1) (a) defines “Child witness” as:
“a person twelve years old or less whom the people intend to call as witness in a grand jury proceeding to give evidence concerning any crime defined in article [130 or 260] or section 255.25, 255.26 or 225.27 of the penal law of which the person was a victim.”
CPL 190.32 (1) (b) (ii) defines “Special witness” as:
“a person whom the people intend to call as a witness in a grand jury proceeding and who is . . .
“[m]ore than twelve years old and who is likely to suffer very severe emotional or mental stress if required to testify in person concerning any crime defined in article [130 or 260] or section 255.25, 255.26 or 225.27 of the penal law ... of which the person was a victim.”
CPL 65.00 (1) defines “Child witness” as:
“a person fourteen years old or less who is or will be called to testify in a criminal proceeding, other than a grand jury proceeding, concerning an offense defined in article [130 or 260 or section 255.25 of the penal law] which is the subject of such criminal proceeding.”
Insofar as Executive Law § 642-a defines the terms “child witness” and “special witness,” it does so only by reference to CPL 190.32, a provision which applies only in the context of grand jury proceedings. In addition, insofar as Executive Law § 642-a defines the term “child witness” in the context of a trial setting, as a person 14 years old or less, it defines that term, by reference to CPL 65.00, only for the purpose of determining whether the witness can testify by closed-circuit television.
Executive Law § 642-a does not define the term “child witness” in the context presented at bar, to wit, where the witness is testifying in person at the trial of the defendant accused of victimizing that witness. Even more significantly, for purposes of the issue on appeal, Executive Law § 642-a (4), the subdivision of the statute that is the most all-inclusive, does not separately define the term child witness. Nor does Executive Law § 642-a define the term “child victim,” which is used both *263 in the statute’s preface, as well as in the first three subdivisions thereof. Additionally, as noted by the County Court, the statute employs the phrases “child victim” and “child witness” somewhat interchangeably and, arguably, uses the terms in reference to the same individual.
Given the foregoing observations, it is not readily discernible from the language of Executive Law § 642-a whether its provisions were meant to be applicable to the present situation, which involves a witness who was 15 years old at time of trial. Accordingly, under such circumstances, examination of the legislative intent is in order.
As stated by the Court of Appeals in People v White (73 NY2d 468, 473-474 [1989], cert denied 495 US 859 [1989]):
“The controlling principle in interpreting statutes is the legislative intent (Ferres v City of New Rochelle, 68 NY2d 446, 451; Matter of Albano v Kirby, 36 NY2d 526, 529-530; Matter of Petterson v Daystrom Corp., 17 NY2d 32, 38). Obviously, evidence of it is first sought in the words the Legislature has used (Sega v State of New York, 60 NY2d 183, 191; Riegert Apts. Corp. v Planning Bd., 57 NY2d 206, 209; People v Graham, 55 NY2d 144, 151). But we may not stop there; the spirit and purpose of the act and the objects to be accomplished must also be considered (New York State Bankers Assn, v Albright, 38 NY2d 430, 436; Ferres v City of New Rochelle, supra, at 446; Uniformed Firefighters Assn, v Beekman, 52 NY2d 463, 471).”
In the case at bar, examination of the legislative intent behind the passage of Executive Law § 642-a is illuminating, and supports the conclusion that the statute was specifically meant to encompass a child victim who must bear in-person witness against an individual accused of his or her victimization. In particular, the legislature made the following statement in connection with the passage of Executive Law § 642-a:
“The legislature recognizes that a significant number of children under sixteen years of age are victimized by crime, and that these children are particularly vulnerable to criminal attacks by adults, including family members. The legislature further recognizes that children who are called upon to testify as witnesses in criminal proceedings involv *264 ing crimes allegedly committed against them may suffer additional trauma. The legislature finds and declares that special protection, consideration and assistance must be provided child victims and witnesses to minimize such trauma, and any ensuing problems occurring later in life that such trauma may cause.
“This act [adding section 642-a and amending sections 621, 624, 626, 627, 631-a, and 642] accords child victims and witnesses additional rights, protections and services during their involvement with the criminal justice system” (L 1986, ch 263, § 1).
Moreover, review of other legislative material that was generated attendant to the passage of Executive Law § 642-a clearly reveals that the statute was intended to cover “child victims and witnesses” who were under the age of 16 years (Bill Jacket, L 1986, ch 263).
It cannot be disputed that, at least in a colloquial sense, J was a child victim, inasmuch as the criminal acts committed against her took place when she was between the ages of 11 and 15 years. Given this fact, and in light of the above expression of intent by the legislature indicating that it desired to afford special protection to “children under sixteen years of age [who] are victimized by crime” (L 1986, ch 263, § 1) and who are called upon to testify, the County Court properly concluded that J came within the purview of Executive Law § 642-a. In particular, the court properly relied on subdivision (4) of the statute, which, as noted, simply states: “[t]he judge presiding should be sensitive to the psychological and emotional stress a child witness may undergo when testifying” (emphasis added).
Further, there is precedent for interpreting Executive Law § 642-a (4) to permit a child witness to hold a “comfort item,” such as a teddy bear, while testifying in order to alleviate the child’s psychological and emotional stress. In People v Gutkaiss (206 AD2d 628 [1994]), which involved the prosecution of a defendant accused of sexually abusing two boys, the Appellate Division, Third Department, concluded that the statute provided a basis for permitting a child witness to have a teddy bear with him as a comfort item while testifying. In relevant part, the Court stated:
“Defendant further claims he was prejudiced by the fact that victim A held a teddy bear while he testi *265 fied. We disagree since County Court informed the jury that the teddy bear had ‘nothing to do with the truth or falsity of this witness’ [sic] testimony, . . . you should [not] consider and evaluate the witness on [the] basis ... he had a teddy bear in his possession’. Additionally, permitting victim A to hold the teddy bear was entirely appropriate in view of Executive Law § 642-a (4), which directs the Judge presiding at a trial of this type to be sensitive to the psychological and emotional stress a child witness may undergo when testifying” {id. at 631).
Cases from other jurisdictions are in accord (see State v Dickson, 337 SW3d 733, 743-744 [Mo Ct App 2011] [holding that trial court did not improvidently exercise its discretion in allowing a child victim to hold a comfort item after balancing the benefit to the witness against any potential prejudice to the defendant]; State v Powell, 318 SW3d 297, 304 [Mo Ct App 2010] [the Missouri Court of Appeals permitted 16 year old to have a teddy bear while testifying, and stated, “(w)e . . . emphasize that trial courts must be cognizant of the possibility that comfort items or other accommodations for minors may unfairly engender sympathy for complaining witnesses . . . Nevertheless, in this case, we conclude that the trial court properly weighed the impact of the teddy bears on the witnesses and the jury”]; State v Marquez, 124 NM 409, 411, 951 P2d 1070, 1072 [1997] [the court held it was not error to allow a child victim of sexual assault to hold a teddy bear while testifying when court “properly balanced” her need against possibility of prejudice]).
Of course, the case at bar involves a live animal, as opposed to an inanimate object. Nevertheless, we perceive no rational reason why, as per the broad dictate of Executive Law § 642-a (4), a court’s exercise of sensitivity should not be extended to allow the use of a comfort dog where it has been shown that such animal can ameliorate the psychological and emotional stress of the testifying child witness. Morever, contrary to the defendant’s argument, the conclusion that Executive Law § 642-a (4) can be interpreted to permit the use of a comfort dog at trial does not usurp the province of the legislature.
As explained above, the clear mandate of Executive Law § 642-a is to render the judicial process less threatening to child victims who necessarily become engaged in that process. Hence, the statute sets out specific ways to accomplish its intended purpose, to wit, allowing children to testify “via live, two-way closed-circuit television” (Executive Law § 642-a [5]), permit *266 ting a “person supportive of the ‘child witness’ ” to accompany the child witness (Executive Law § 642-a [6]), and allowing the child witness “to use anatomically correct dolls and drawings during his [or her] testimony” (Executive Law § 642-a [7]). However, before these specific accommodations are enumerated, the statute contains the broadly worded subdivision (4), which provides that a judge “should be sensitive to the psychological and emotional stress a child witness may undergo when testifying.” Since it included what can be characterized as a preceding “catch-all” provision (i.e., subdivision [4]), it is apparent that the legislature did not intend the subsequent specific measures (i.e., subdivisions [5], [6], and [7]) to be the sole means by which the court could accommodate a child witness. Instead, the legislature recognized that a trial court should be provided with the flexibility to adopt or permit additional accommodations, other than those specifically mentioned in the other sections of the statute.
Indeed, the language of subdivision (4) is so general that it can only be interpreted as authorizing a trial judge to utilize his or her discretion in fashioning an appropriate measure to address a testifying child witness’s emotional or psychological stress, based upon the particular needs of that child (see People v Gutkaiss, 206 AD2d 628 [1994]; cf. People v McNair, 87 NY2d 772 [1996]; see also Goings v United States, 377 F2d 753, 762 [8th Cir 1967] [a “trial judge should exercise his (or her) discretion with wide latitude to assure an atmosphere in which a witness will feel at ease in telling the truth”]; State v Cliff, 116 Idaho 921, 924, 782 P2d 44, 47 [1989] [“(i)n cases . . . where it is necessary to receive testimony from young children, the court must strike a balance between the defendant’s right to a fair trial and the witness’s need for an environment in which he or she will not be intimidated into silence or to tears”]).
Insofar as the defendant contends that the County Court was required to make a finding of necessity, i.e., that J needed Rose to be able to testify, before the court allowed such accommodation, the defendant failed to raise this argument before the County Court and it is, thus, unpreserved for appellate review (see CPL 470.05 [2]). In any event, this argument is without merit. Executive Law § 642-a (4) does not set forth any “necessity” criterion for a court to adopt measures intended to address the stress which a child witness may experience on the witness stand. Indeed, the statute specifically recites that the trial judge should be sensitive to the “psychological and *267 emotional stress a child witness may undergo when testifying” (emphasis added), and not the stress which the witness will definitely experience. Nor have other jurisdictions adopted a 1 ‘compelling-need’’ standard in this regard. “Instead, courts that have addressed the issue have emphasized the need to strike a balance between the right of the accused to a fair trial and the need to mitigate the intimidating environment for some child witnesses” (State v Brick, 163 Wash App 1029, *2 n 5 [2011]; see State v Powell, 318 SW3d 297 [2010]; State v Marquez, 124 NM 409, 951 P2d 1070 [1997]; State v Cliff, 116 Idaho 921, 782 P2d 44 [1989]). Here, the testimony given by Stella provided ample evidence that Rose’s presence alleviated J’s anxiety and allowed her to more easily discuss the conduct which was perpetrated against her, which, of course, was the very subject of the trial.
Inherent Power of Trial Judge
In a similar vein, we note that New York courts have long held that a judge conducting a public trial is empowered to control the proceedings in whatever manner may be consistent with the demands of decorum and due process (see People v Hagan, 24 NY2d 395, 397 [1969], cert denied 396 US 886 [1969]; People v Mendola, 2 NY2d 270, 276 [1957]; People ex rel. Karlin v Culkin, 248 NY 465 [1928]; People v Hargrove, 60 AD2d 636, 637 [1977], cert denied 439 US 846 [1978]; see also People v Sorge, 301 NY 198, 202 [1950] [trial courts possess “wide latitude and . . . broad discretion ... to administer a trial effectively”]; Bowers, Judicial Discretion of Trial Courts § 262 at 296-297 [1931]). Here, the defendant has made no showing that Rose’s presence had any identifiable impact on the proceeding. Moreover, as indicated above, the County Court specifically informed the jury that it was not to draw any inference in favor of or against either side because of the dog’s presence. Thus, in addition to the statutory basis afforded by Executive Law § 642-a, the County Court’s decision to allow Rose into the courtroom and at the witness stand during J’s testimony was also a proper exercise of its inherent power and discretion to control the trial proceedings (see e.g. People v Spence, 212 Cal App 4th 478, 513 [2012] [a therapy dog could accompany the child witness based, inter alia, upon “the general discretionary standards set forth in (the California Evidence Code) for control of a courtroom”]; Sexton v State, 529 So 2d 1041, 1044-1045 [Ala Ct Grim App 1988] [affirming a defendant’s conviction even though the prosecutor sat with the five-year-old victim as she testified, and *268 explaining that the “trial judge was in the best position to determine what, if any, probable effect this action would have on the jury”]).
Due Process/Prejudice
Turning to the defendant’s second argument, we conclude that Rose’s accompaniment of J to the witness stand did not adversely affect the defendant’s due process right to a fair trial or compromise his constitutional right of confrontation. In Holbrook v Flynn (475 US 560 [1986]), the United States Supreme Court explained that
“[w]henever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether ‘an unacceptable risk is presented of impermissible factors coming into play’ . . .
“[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over” (id. at 570, 572, quoting Estelle v Williams, 425 US 501, 505 [1976]).
The defendant offered no support for his contention that Rose’s presence was inherently prejudicial and, thus, violated his due process right to a fair trial, because Rose allegedly conveyed the impression that J was being truthful as she testified. Indeed, the defendant admits that Rose was trained merely to respond to a person’s stress level. It is beyond dispute that a dog does not have the ability to discern truth from falsehood and, thus, cannot communicate such a distinction to a jury. Nor can it he concluded that any actual prejudice resulted from the concededly unobtrusive presence of the dog in the courtroom.
We are not unmindful that Rose may have engendered some sympathy for J in the minds of the jurors. However, there is no proof that such sympathy was significantly greater than the normal human response to a child’s testimony about his or her sexual abuse at the hands of an adult. Moreover, the County Court gave the jury specific instructions that it must not permit sympathy to enter into its considerations, especially with respect to “an outside factor such as a companion dog permitted to be present in the courtroom.” A jury is presumed to follow the legal instruction provided by the trial court (see People v Guzman, 76 NY2d 1, 7 [1990]). Nor did defense counsel suggest any further instruction regarding Rose’s presence.
*269 We are also guided by some recent decisions from foreign jurisdictions which have had occasion to address the topic of whether a defendant is prejudiced by the presence of a dog during trial testimony. For example, in a case from the State of Washington, State v Dye (170 Wash App 340, 283 P3d 1130 [2012], lv granted 176 Wash 2d 1011, 297 P3d 707 [2013]), which was decided in August 2012, the Washington Court of Appeals concluded that the trial court properly allowed a comfort/service dog named Ellie to accompany a mentally disabled adult victim/ witness to the stand while he testified at the defendant’s trial. In Dye, the court specifically rejected many of the same arguments that the defendant raises on this appeal regarding the prejudice and due process issues. In particular, the Dye court stated:
“[In support of its pretrial motion to allow the dog to accompany the witness on the stand] the State represented that [the victim] ‘is experiencing significant anxiety regarding his upcoming testimony,’ which diminished when [the victim] was with Ellie
“[The defendant] contends[, inter alia,] that Elbe’s presence deprived him of a fair trial... by improperly inciting the jury’s sympathy and encouraging the jury to infer [the victim’s] victimhood, and by giving [the victim] an incentive to testify in the prosecution’s favor. . . .
“Here, the necessary balancing is implicit in the court’s ruling. The court did not think Ellie would distract the jury, and observed that the dog was ‘very unobtrusive [and] will just simply be next to the individual’ . . . Given [the victim’s] ‘significant emotional trauma,’ the court concluded Elbe’s presence was appropriate” (State v Dye, 170 Wash App at 344-345, 348, 283 P3d at 1132, 1134).
In People v Spence (212 Cal App 4th 478 [2012]), decided in December 2012, the California Court of Appeals engaged in a thorough discussion of the issue and sanctioned the use of a therapy dog at the trial of a defendant who was ultimately convicted of the sexual abuse of a 10-year-old girl. In part, the Spence court stated:
“[Regarding] the use of the therapy dog, the [trial] court referred to the discretion granted to it under *270 [California] Evidence Code section 765 to control court proceedings in the search for truth, and commented that there would be no prejudice in allowing the therapy dog to be present in the courtroom. The court said it was comparable to [the witness] holding a ‘cute teddy bear in her hands’ to provide her comfort. The court explained to counsel that this particular therapy dog had been in the same courtroom before, ‘and she’s almost unnoticeable once everybody takes their seat on the stand. She’s very well-behaved . . . The record does not show any [issues or improper behavior by the dog] arose [during the course of the trial].
“In addition to the general discretionary standards set forth in Evidence Code section 765, for control of a courtroom, the provisions of section 868.5, subdivision (a) apply to a [prosecution] witness in a case involving a . . . sex offense. The witness ‘shall be entitled, for support, to the attendance of up to two persons of his or her own choosing ... at the trial, . . . during the testimony of the prosecuting witness . . .
“[I]t is easy to conclude that therapy dogs are not ‘persons’ within the meaning of section 868.5 [and] since subdivision (b) of section 868.5 refers to the court’s duty to give admonitions under section 868.5 that the advocate must not sway or influence the witness, we cannot imagine that the Legislature intended that a therapy dog be so admonished, nor could any dog be sworn as a witness ... In any case, the trial court took care to ensure that the therapy dog would be mainly unnoticeable once everybody took their seats, and that corrective action would be taken if there was a problem, which there was not.
“[Accordingly, although] the circumstances of this case with respect to the use of the therapy dog simply do not fall within the coverage of section 868.5, [nevertheless,] [t]he court appropriately exercised its discretion under Evidence Code section 765, subdivision (b), to set reasonable controls upon the mode of interrogation of the child witness, by providing a therapy dog in this exercise of ‘special *271 care to protect [the witness] from undue harassment or embarrassment’ ” (id. at 513, 517).
As was true in both of the above cases, the County Court herein balanced J’s demonstrated need for Rose during her testimony against the potential prejudice to the defendant. It then properly concluded that, with clarifying instructions to the jury, the unobtrusive presence of the dog was appropriate in this case.
Right of Confrontation
There is no merit to the defendant’s contention that Rose’s presence violated his constitutional right to confront witnesses against him. The defendant first contends that, at certain points during J’s testimony, the dog physically impeded the jury’s ability to observe J as she testified. However, no such complaint or any objection was ever made during the trial. Indeed, at the conclusion of J’s testimony, the following colloquy took place:
“Prosecutor: Just so the record is clear, I want to make a record of Rose’s behavior during [J’s] testimony, that she sat unobtrusively with the witness. There were no noises coming from the dog.
She did not move around. Certainly, [defense counsel] did not bring anything to the court’s attention about her behavior during the actual testimony, and I think the record should be clear that the dog sat peacefully and quietly on the stand.
“Court: [addressing defense counsel] [I]s that unfair?
“Defense Counsel: No, Judge.
“Court: I mean initially the dog was being petted by the witness, and then the dog apparently disappeared. The dog was innocuous, in no way obtrusive” (emphasis added).
Thus, there is no basis to conclude that Rose physically interfered with the defendant’s right to confront a witness against him (cf. Coy v Iowa, 487 US 1012, 1019-1020 [1988] [a defendant’s right of confrontation was violated when the court permitted a screen to be placed in front of the testifying witness so as to shield the witness from the defendant’s view]).
The defendant also contends that Rose’s presence infringed on his right of confrontation because the dog’s “presence made it unlikely that the jury was able to utilize [its] common sense *272 and experience in making a determination as to J’s truthfulness.” To the extent that the defendant argues that Rose’s presence made it more likely that the jury would credit J’s testimony as truthful, we disagree. “Normally the right to confront one’s accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses” (Pennsylvania v Ritchie, 480 US 39, 53 [1987]). Here, defense counsel engaged in extended and thorough cross-examination of J. Consequently, our review of the record does not suggest to us that Rose impeded defense counsel’s right to cross-examine the central witness in the People’s case against the defendant (see State v Dye, 170 Wash App at 346, 283 P3d at 1133).
There is also no indication that the jury deemed Rose’s presence to be, in effect, a corroboration of J’s testimony. In People v Adams (19 Cal App 4th 412, 437 [1993]), the California Court of Appeals addressed that issue in the context of a California statute which allows a victim/witness to have a support person present during trial testimony. As the Adams court explained:
“The presence of a support person at the stand does not necessarily rob an accused of dignity or brand him or her with an unmistakable mark of guilt. The presence of a second person at the stand does not require the jury to infer that the support person believes and endorses the witness’s testimony, so it does not necessarily bolster the witness’s testimony. Finally, the presence of a support person does not interfere with the decorum of the judicial proceedings. Consequently, in the absence of an articulable deleterious effect on the presumption of innocence, we must reject the contention that use of a support person at the stand deprives the defendant of a fair trial” (id. at 437).
The same is true when considering the presence of a therapy animal at or near the witness stand. In fact, permitting a comfort dog to accompany a child victim to the stand during testimony can be considered less prejudicial than allowing “support persons.” As explained in Using Dogs for Emotional Support of Testifying Victims of Crime, an article by Marianne Del-linger for the Animal Law Review of Lewis and Clark Law School:
“While dogs may signal the innocence of a witness, any signal from a dog will be much weaker than that emitted from an adult attendant. An adult, es *273 pecially one who can understand the entirety of the case, including its legal underpinnings, may be seen by a jury to add credibility to the arguments of the plaintiff’s witness. In contrast, a dog is ‘neutral’ and does not understand any of the legal and factual arguments. It serves the limited function of physically and emotionally standing by the testifying witness” (Marianne Dellinger, Using Dogs for Emotional Support of Testifying Victims of Crime, 15 Animal L 171, 186 [2009] [emphasis added]).
Furthermore, it should again be noted that the County Court specifically informed the jury that it was not to draw any inference in favor of or against either side because of the dog’s presence, and it must be presumed that the jury followed the legal instructions it was given {see People v Baker, 14 NY3d 266, 274 [2010]; People v Guzman, 76 NY2d 1, 7 [1990]; People v Ward, 106 AD3d 842 [2013]).
Finally, if, as the defendant contends on appeal, Rose was, in effect, a silent witness against him, defense counsel had the opportunity to explore such possibility. Tellingly, however, defense counsel did not pose any questions to J during cross-examination regarding Rose’s presence or the effect that the dog had on J. Nor did defense counsel make any reference to Rose during his summation to the jury.
Use of Dogs for Emotional Therapy The defendant failed to preserve for appellate review his argument that the County Court should have conducted a Frye hearing before it ruled on whether to permit Rose to be present while J testified {see CPL 470.05 [2]). This argument is without merit in any event. “There is already a significant amount of research showing that the mere presence of a dog can have dramatic emotional and psychological benefits” (Andrew Leaser, See Spot Mediate: Utilizing the Emotional and Psychological Benefits of “Dog Therapy” in Victim-Offender Mediation, 20 Ohio St J on Disp Resol 943, 961 [2005]).
“Dogs have a natural ability to calm humans as well as a positive effect on our emotional and psychological states. [They] help us break down the barriers of fear, distrust, and anxiety so we can get to the truth [and] [scientific studies have shown that dogs help people by reducing blood pressure, stress and anxiety, improving feelings of self-worth and decreasing loneliness” (Marianne Dellinger, Using Dogs for *274 Emotional Support of Testifying Victims of Crime, 15 Animal L 171, 178, 179 [2009] [internal quotation marks omitted]).
There is also substantial anecdotal evidence that dogs have been found to have beneficial effects on the emotional and even physical well-being of hospital patients, residents of nursing homes, and those suffering from psychological trauma, including the victims of the recent shootings in Newtown, Connecticut, and the Boston Marathon bombings (see Michael Walsh, Comfort Dogs Head to Help Victims of Boston Bombings, NY Daily News, Apr. 17, 2013). Given this background, the utilization of a comfort dog to support vulnerable witnesses who are called upon to testify in court is an “accommodation” which, under appropriate circumstances, not only fully comports with this state’s legislation intended to assist such witnesses, but should also be encouraged as an effective and beneficial courtroom measure in administering a trial.
Remaining Issues
Contrary to the defendant’s contention, the County Court did not improvidently exercise its discretion under CPL 60.42 (5), the so-called Rape Shield Law, in precluding evidence concerning the victim’s sexual history. This statute generally provides that “[e]vidence of a victim’s sexual conduct shall not be admissible in a prosecution for [rape]” (CPL 60.42). A trial court’s rape-shield ruling will be upheld unless it was an improvident exercise of the court’s discretion, and deprived the defendant of his right of confrontation (see People v Mandel, 48 NY2d 952, 954 [1979]; People v Reardon, 141 AD2d 869, 870 [1988]). Here, the defendant’s offer of proof as to whether another man had impregnated J consisted of the fact that this man had lived next door to her, possibly at the time of conception, that J had been seen texting people, and that, at an uncertain time, J had made a drawing with a picture of a heart, a baby, and the other man’s name. The defendant’s offer of proof that J became pregnant by someone other than the defendant was based on pure speculation and, therefore, was insufficient to overcome the presumption that such evidence should be precluded pursuant to the Rape Shield Law (see CPL 60.42; People v Wieners, 33 AD3d 637, 638 [2006]; People v Mitchell, 10 AD3d 554, 555 [2004]; People v Rendon, 301 AD2d 665 [2003]). Finally, we note that the defendant was given ample opportunity to develop evidence to support his contention that the victim’s alleged behavioral problems motivated her to accuse him falsely *275 of the charged crimes (see People v Russillo, 27 AD3d 493 [2006]).
The defendant’s remaining contentions are unpreserved for appellate review.
Conclusion
Under the circumstances of this case, the County Court properly allowed Rose, the comfort-therapy dog, to accompany the child victim/witness on the witness stand during her testimony. The defendant has not shown that this accommodation was impermissible under Executive Law § 642-a; or that it impaired his right to a fair trial; or that it compromised his constitutional right of confrontation and cross-examination. Moreover, as explained above, none of the defendant’s remaining arguments requires reversal. Accordingly, the judgment is affirmed.
Mastro, J.E, Dickerson and Hinds-Radix, JJ., concur.
Ordered that the judgment is affirmed.