# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAKOTA LEE SHORTER,

        Defendant-Appellant.

FOR PUBLICATION
June 7, 2018
9:05 a.m.

No. 338629
Ingham Circuit Court
LC No. 16-000519-FH

Before: SHAPIRO, P.J., and M. J. KELLY and O'BRIEN, JJ.

SHAPIRO, P.J.

Defendant appeals his jury conviction of third-degree criminal sexual conduct (CSC-III) (incapacitated complainant), MCL 750.520d(1)(c), and fourth-degree criminal sexual conduct (CSC-IV) (incapacitated complainant), MCL 750.520e(1)(b). The trial court sentenced defendant to 30 to 180 months' imprisonment for the CSC-III conviction and 12 to 24 months' imprisonment for the CSC-IV conviction. On appeal, defendant argues that the trial court erred by granting the prosecution's motion to allow the complaining witness to testify while accompanied by a support dog and its handler. We agree, and so reverse and remand for a new trial.

## I. FACTS AND PROCEDURAL BACKGROUND

The incident giving rise to the charges occurred early in the morning of May 1, 2016, in complainant's home in a mobile home community. Complainant and defendant both testified at trial, and their testimony about the events of the day are generally consistent until the point in time when they prepared to go to sleep. Complainant and defendant, along with two other friends, traveled to a rodeo together in complainant's car. The group had planned to camp nearby that night after the rodeo, but it rained and they decided to drive home instead. Defendant drove the group home in complainant's car and dropped off the other two friends first. When they arrived at complainant's home, it was about 4:30 a.m., so she told defendant that he could sleep on an air mattress at her home that night and that she would drive him to his house when they woke up. Defendant and complainant had known each other for some time as friends. They had never spent the night together or had any sexual contact with each other, although they both agreed that they had been flirting during the day. After entering the complainant's home, they discovered that the air mattress had been left in the car and because it was raining, neither wanted to go back outside to get it. Complainant answered a phone call and sat on her bed when conversing. During that time, defendant lay down with his head on her upper leg, and

1

complainant did not object. From this point in the chronology, the complainant's and defendant's testimony differ significantly.

Complainant testified that she told defendant that he could sleep with her in her queen-sized bed but that she would not engage in any sexual contact. She testified that "[w]e agreed that we could—as both adults we could sleep in my bed without being intimate, and I made that very clear to him." She explained that they dressed in separate rooms, and that she was clothed in leggings and a t-shirt with a bra underneath. According to complainant, at about 6:30 a.m., she woke to the sound of her roommate leaving for work, and discovered that defendant was sexually assaulting her. She testified that "[w]hen I woke up to my roommate leaving for work, I was on my back and [defendant] was to the left of me and he had unfastened my bra and his left hand was in my pants." She explained that defendant had pulled down the front of her leggings, that he was penetrating her vagina with his fingers, and that his other hand was underneath her shirt and bra on her breast. Complainant stated she was "terrified," and immediately jumped up, told defendant she needed to go to the bathroom, and went to the end of the hallway to her roommate's room to seek help from Tyler Johnson, her roommate's boyfriend.

Defendant's testimony as to what occurred before they fell asleep differed from complainant's only in that he testified that she did not make any statements about not wanting to have any sexual contact. Defendant testified, however, that he did not expect that there would be any sexual activity and that they changed clothes in separate rooms. Defendant testified that he was awakened by the sounds of the roommate leaving, and that when he awoke; he found that complainant had wrapped herself around him, i.e. she had "cuddled up" to him. According to defendant, complainant's leg was across his waist and her head was on his chest. He stated that he attempted to roll her off him by pushing her hip and thigh, but that she "snuggled" back. He admitted that he kissed her on the forehead. Defendant testified that he then fell back asleep. He testified that there had been no sexual contact that the complainant's behavior after she awoke was a complete surprise, and that he did not understand it. On cross-examination, he agreed that he did not have the complainant's consent to do anything sexual, and repeated that he had not done so. He was also asked about statements he had made to the officer that the prosecution argued were inconsistent with his testimony. Defendant agreed that he told the officer that he touched complainant's butt and thigh, and explained that this occurred while he was attempting to move her off him. When asked whether he had admitted to the officer that he had touched complainant's belly and back under her shirt, defendant denied making such a statement. Defendant also testified that he could not offer a reason why the complainant would make up the charges against him.

Johnson, complainant's housemate's boyfriend, testified that when complainant entered his room that morning, she was so upset that he could barely understand her. Because Johnson's phone was dead, he and complainant walked to the park manager's home to call the police. The manager described complainant's emotional state as "absolutely hysterical to the point I couldn't understand her." He concluded that complainant was saying that there was a dead body in her bed and he informed the police of this in his 911 call. The manager testified that he then walked back to complainant's house just as defendant was coming out the door and he told defendant

2

that he should come with him because he had been reported as dead. Finally, he testified that when he and defendant reached his house, he asked defendant if he had done something wrong and defendant responded, "Yea, I did."[1] The police officers, who testified, agreed that the complainant was very upset when they arrived. One officer testified that "[s]he was shaking and her breathing was to the point where almost hyperventilating."

After giving her statement to the police, the complainant went to Sparrow Hospital for a sexual assault examination. The sexual assault nurse examiner found no injury to the complainant's vaginal area. A DNA test of the surface of her breast revealed male DNA, but upon testing, it was concluded that the DNA did not belong to defendant. Before the start of trial, the prosecutor and defense counsel informed the court of these results, and the parties agreed that it was not necessary to present a full chain of custody for the DNA.

It appears uncontested that the defense counsel was not informed prior to trial that the prosecution intended to have complainant testify while accompanied by a support dog and the animal's handler. It was first raised during voir dire when the prosecutor asked potential jurors about the possibility of a support animal in the courtroom while the complainant testified. On the following trial day, before opening statements, the prosecution raised the issue again. When the judge learned that in addition to the dog, a handler would have to be present next to the witness stand to hold the dog's leash, she expressed concern about whether there was evidence of a "necessity for that support animal." Defense counsel objected to the use of a support dog noting that there had to be "some basis for the need for that animal to be here. You know, I usually experience this in kid's cases or something of that nature, and we're dealing with an adult woman. I'm not sure if there's some special exception that gives rise to the need for this, but at this point I would ask that she testify solely on her own." The trial court citing *People v Johnson*, 315 Mich App 163; 889 NW2d 513 (2016), stated that "there should be some kind of a showing of a need that it would promote the expeditious and effective ascertainment of the truth." The prosecution responded:

> Judge, I think my response to that is that it will limit her emotional outbursts when she's testifying. This is a victim who has been teary eyed multiple times when I've spoken to her, without even getting into, you know, the facts of what occurred to her and the actual testimony that she will be giving. We did a trial preparation meeting at my office last week where Preston, the dog, was present. She was less emotional with him in the room. She indicated she felt more comfortable and that is something that she wants. I think that it—it would

---

[1] Defendant testified on cross-examination that he was not certain whether the manager asked him this question. When asked if he responded, "Yeah, I did," to that question he stated, "I don't remember me saying that, but I can tell you I didn't do anything to even reason me saying that." He then agreed that he didn't remember whether he said it or not and the prosecutor pursued it further, asking "Okay, so it's possible you said that to him." Defendant responded, "Yes, it is possible, but no, it's not probable because I didn't do anything to cause me saying that."

3

be a benefit to both sides to have her control her emotions through the use of the support dog.

The trial court then granted the prosecution's request, concluding, "That's sufficient for this Court in that it will limit her emotional display on the stand. I agree that that could even be beneficial to the Defendant. And that there's already been, sort of, a trial run with the dog and it's been a successful one at that. So, I think that's a sufficient basis for her to use the support animal while testifying."

When instructing the jury at the outset of the complainant's testimony and, again, at the end of the trial, the court instructed the jury that you must "not allow the use of a support animal to influence your decision in any way," and that "you should not consider the witness's testimony to be any more or less credible because of the animal's presence." Closing arguments focused on the credibility of the complainant and defendant, and who the jury should believe. The jury returned, after several hours, and advised the court that they had reached a verdict as to the CSC IV charge, but not as to the CSC III charge. The court gave them the deadlocked jury instruction; they resumed deliberations, and sometime later, returned a verdict of guilty on both counts.

## II. ANALYSIS

Defendant contends that the trial court erred in allowing the complainant to testify while accompanied by a support animal and its handler.[2]

In making its ruling, the trial court relied on *People v Johnson*, 315 Mich App 163; 889 NW2d 513 (2016). In that case, the defendant was accused of sexually assaulting his six-year-old niece, and the trial court permitted a support dog to be with the six year old and her ten-year-old brother during their testimony. *Id*. at 171-172. The defense appealed on the ground that allowing the support dog was improper. *Id*. at 173. The *Johnson* Court affirmed the conviction finding no error and concluding, as a matter of first impression that allowing the use of a support dog is within the authority of a trial court and is not "inherently prejudicial." *Id*. at 181. *Johnson* also held that pre-trial notice of an intent to use a support animal was not required because the statute requiring notice, MCL 600.2163a(4), was directed only at "support persons," and makes no reference to support animals. *Id*. at 175-176.

The first question before us, therefore, is whether *Johnson* controls our decision. We conclude that it does not. In reaching this conclusion, we are cognizant of the fact that the language used in *Johnson* sweeps with a broad brush, and that the opinion contains language which, if one does not consider the facts of the case, could seem to be dispositive here. However, we conclude that there is a fundamental difference between allowing a support animal

---

[2] Defendant argues that the prosecution committed misconduct by failing to give proper notice and that his attorney was ineffective for failing to object. Because of our decision, we need not address the question of notice or the performance of defense counsel. We note, however, that defense counsel did object to the use of the support dog as quoted above.

4

to accompany a child witness, as in *Johnson*, and allowing the animal to accompany a fully abled adult witness, as in the instant case. Accordingly, we conclude that *Johnson's* holding was tied to the facts presented, i.e., the use of a support animal during a *child's* testimony. We do so for several reasons.

First, allowing support animals for able-bodied adults would be unprecedented, not only in Michigan, but apparently nationwide. *Johnson* cites too many out-of-state cases in support of its conclusion, but each of the cited cases involved a witness who was either a child or an adult with a developmental disability. Indeed, despite our efforts, we have been unable to find a case in *any* jurisdiction allowing the use of a support animal or a support person when the witness is a non-disabled adult. Therefore, *Johnson's* observation that "other jurisdictions have upheld this procedure as part of a trial court's inherent authority to control the courtroom," *Id*. at 171, while broadly stated, rests solely on cases involving children or developmentally disabled adults.

Second, the reliance placed on MCL 600.2163a in *Johnson* is inapposite because that statute, by its terms, applies only if the witness is a child or a developmentally disabled adult. *Johnson* noted that this statute grants a trial court the authority to allow a support person, or take other action, to protect a witness such as using a screen. *Johnson*, 315 Mich App at 176-177. However, by its terms, MCL 600.2163a limits this authority to cases in which the witness is either "a person under 16 years of age," or "a person 16 years of age or older with a developmental disability," or a "vulnerable adult." The statute defines "developmental disability" as "a condition that is attributable to a mental impairment or to a combination of mental or physical impairments." MCL 600.6123a(1)(d). The term "vulnerable adult" is defined as: "an individual age 18 or over who, because of age, developmental disability, mental illness or physical disability requires supervision or personal care or lacks the personal and social skills required to live independently;"[3] "[a] person who is placed in an adult foster care small group home . . .;"[4] or a person, "unable to protect himself or herself from abuse, neglect, or exploitation because of a mental or physical impairment or because of advanced age."[5] There is nothing in the record to suggest that the complainant was developmentally disabled, mentally ill, physically disabled so as to require supervision, or that she was unable to live independently. MCL 600.6123a; MCL 750.145m(u)(i). Accordingly, although MCL 600.6123a provided authority for the trial court in *Johnson*, it does not do so in this case.

Third, *Johnson* refers to the trial court's inherent authority over the courtroom. We agree that this authority is broad and that the practice of allowing child witnesses to have a support animal or person is common enough that it is comparable to the examples offered in *Johnson* of that authority. However, allowing an able-bodied adult witness to have support animals or persons with them during testimony is a different circumstance. Given that we cannot find a single prior example of any court allowing such a procedure, we hesitate to conclude that it is

---

[3] MCL 750.145m(u)(i).

[4] MCL 400.703(1)(b).

[5] See MCL 400.11(b), (f).

simply a matter of a trial judge's inherent authority. If that were so, one would presumably be able to find prior examples of that authority being exercised somewhere.

Fourth, we note that the *Johnson* decision repeatedly and properly notes the tender ages of the children testifying. Moreover, we find nothing in the opinion, despite its broad language, that indicates that the Court even considered whether its holding would apply in the setting of a fully abled adult. As already discussed, none of the cases relied on in *Johnson* considered the issue in that context.[6]

Lastly, we note that *Johnson* made no mention of allowing an animal handler to also accompany the witness during testimony. In the instant case, the complainant was accompanied not only by the dog, but also by the handler, who is a human being, which unlike the situation in *Johnson*, triggers the requirements of MCL 600.2163(4) even if the witness is a child.

Even assuming a trial court had the inherent authority to allow such a procedure, we would not approve its use where the basis for it was simply that doing so will allow the witness to be "more comfortable" or because "that this is something she wants." Nor are we convinced that allowing a support animal or person so that the witness will be better able to "control her emotions" necessarily aids the truth-finding process. This is particularly so in this case, where the prosecution presented evidence from four different witnesses that the complainant was hysterical, shaking, and barely able to speak following the alleged assault, and argued to the jury that her emotional reactions were evidence of defendant's guilt. In that context, it was particularly improper to allow a comfort dog to help the complainant "control her emotions" while testifying. If the adult complainant's emotional state constitutes evidence of guilt, the jury is entitled to evaluate her emotional state uninfluenced by outside support, not only as to her own credibility, but also to determine the weight to be given to testimony by others who described her emotional state.

For all these reasons, we conclude that allowing the complainant to be accompanied by a support dog during her testimony was error.

Although the prosecution does not ask that we consider whether any such error was harmless, we have done so, and we conclude that the error was not harmless because it undermined the reliability of the verdict. *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67

---

[6] By way of example, the very first line from a passage *Johnson* quoted from *People v Tohom*, 109 AD 3d 253, 272-273; 969 NYS 2d 123 (2013) begins, " 'In fact, permitting a comfort dog to accompany *a child victim* to the stand can be considered less prejudicial than allowing support persons.' " (emphasis added). Similarly, the court in *State v Dye*, 178 Wash 2d 541, 544; 309 P3d 1192 (2013), on which *Johnson* relied, described the witness in that case as "suffer[ing] from significant developmental disabilities, including cerebral palsy, Kallman Syndrome, and mild mental retardation. He has an IQ (intelligence quotient) 65, and although he is 56 years old, he functions at a mental age ranging from 6 to 12 years old."

(2010).[7] There were no witnesses to the actual events other than defendant and complainant, and the only forensic evidence consisted of a different male's DNA. Thus, the case turned almost exclusively on the jury's evaluation of their respective credibility. Secondarily, it turned, in part, on the weight given by the jury to the testimony concerning complainant's state of hysteria after leaving her bedroom that morning. These determinations are likely affected by the use of the support dog and handler. A juror can readily accept that a child might need support simply to be in a courtroom to be able to answer questions. With a fully abled adult, a juror is far more likely to conclude that the reason for the support animal or support person is because the complainant was traumatized by the actions for which the defendant is charged.[8]

In sum, we conclude that a fully abled adult witness may not be accompanied by a support animal or support person while testifying. Indeed, were we to rule that that a fully abled adult may be accompanied by a support dog or person simply because they will be "more comfortable," unlocks a door that we have great hesitation about opening. At a minimum, this

---

[7] In considering whether an error was harmless, "the relevant inquiry is 'the effect the error had or reasonably may be taken to have had upon the jury's decision.' " *People v. Straight,* 430 Mich. 418, 427, 424 NW2d 257 (1988) (citation omitted). The error justifies reversal if it is more probable than not that it affected the outcome. *People v Young*, 472 Mich 130, 141-142; 693 NW2d 801 (2005). An error is "outcome determinative if it undermined the reliability of the verdict." *Id*. at 142 (quotation marks and citation omitted). In making this determination, this Court should focus "on the nature of the error and assess[] its effects in light of the weight and strength of the untainted evidence." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999) (quotation marks and citations omitted). Also, an error should not be considered harmless where "the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings. . . ." *People v Kimble*, 470 Mich 305, 312; 684 NW2d 669 (2004) (quotation marks and citation omitted). If the error is so "offensive to the maintenance of a sound judicial process," then "it can never be regarded as harmless[.]" *People v Robinson*, 386 Mich 551, 563; 194 NW2d 709 (1972).

[8] Our dissenting colleague observes that the testimony of the police officer provided substantive evidence sufficient to uphold the conviction. One could argue to the contrary, but more importantly, the issue of harmless error is not determined by whether a jury could have convicted regardless of the error. Harmless error review turns on "whether the error more probably than not affected the outcome" or "undermined the validity of the verdict." *Young*, 472 Mich at 141-142.

unprecedented change, if adopted, should be made by legislation, court rule, or a decision of our Supreme Court. [9]

        Reversed and remand for new trial. We do not retain jurisdiction.

                         /s/ Douglas B. Shapiro
                         /s/ Michael J. Kelly

---

[9] One example of the unexpected consequences from permitting this practice will arise the first time a criminal defendant requests a support animal while testifying. And allowing support animals for complainants but not defendants may implicate due process concerns.