*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEVEN LEE MONTEZ,

        Defendant-Appellant.

UNPUBLISHED
March 10, 2022

No. 353119
Kent Circuit Court
LC No. 19-003225-FC

Before: RIORDAN, P.J., and K. F. KELLY and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial conviction of one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b). The trial court sentenced defendant to imprisonment of 15 to 50 years and also imposed lifetime electronic monitoring. Defendant appeals as of right. We affirm defendant's conviction, but we remand with instructions to amend the judgment of sentence to remove the lifetime-electronic-monitoring requirement.

## I. BACKGROUND

Defendant's conviction relates to his sexual abuse of NE. He was specifically convicted of CSC-I on the basis that he engaged in penile-oral penetration with NE. Defendant was also charged with an additional count of CSC-I, relating to NE's sister, AE. As charged, defendant was alleged to have engaged in penile-vaginal penetration with AE. The jury, however, found defendant not guilty of the count related to AE.

NE and AE are the children of defendant's former girlfriend. According to NE and AE's mother, she and her children lived with defendant in Grand Rapids between 2004 and May 2008. Her relationship with defendant ended in 2008, and she and her children moved out of his house at that time. According to the testimonies of NE and AE, defendant sexually abused them while they lived in his home. NE testified about being abused on numerous occasions and, in particular, being forced to perform oral sex on defendant in exchange for candy. NE did not, however, recall specifically when the abuse occurred. AE described one instance of sexual assault. AE testified that she had repressed this memory for years before remembering it during a sexual encounter with her boyfriend.

-1-

In addition to the events relating to AE and NE, at trial, the prosecutor also introduced other-acts evidence asserting that defendant committed acts of criminal sexual conduct against three of his nieces: JP, EM, and MD. The events involving defendant's nieces were reported to have occurred between approximately 1997 and 2007. Defendant's nieces reported the sexual abuse by defendant in 2008, prompting a police investigation at that time. MD also told NE and AE's mother about defendant's conduct, which prompted her to end her relationship with defendant and move out of his house.

Shortly after allegations were made by defendant's nieces, AE and NE were asked about defendant and whether he had done anything inappropriate to them. Neither disclosed any abuse at that time; NE and AE were not made aware of the allegations of defendant's sexual abuse of his nieces. Years later, when NE was a freshman in high school, NE told a friend and NE's mother about the abuse, but the matter was not reported to authorities at that time. Later, in September 2018, AE reported the abuse to Children's Protective Services, prompting an investigation that eventually led to the charges and trial in this case.

A few instances that occurred during trial other than the general allegations of defendant's conduct bear mentioning at this point. At one point during trial, AE became emotional while testifying about the time defendant allegedly sexually assaulted her. AE started to cry and asked for her unspecified medication. The trial judge excused the jury from the courtroom so AE could compose herself. The trial judge did not address the incident with the jury when AE's testimony resumed or at any point thereafter.

Additionally, the prosecutor called an expert witness, Thomas Cottrell, who testified about "child sexual abuse disclosure and treatment." According to Cottrell, "half" or "more than half" of child-sexual-assault disclosures are delayed. He asserted that the percentage varies, depending "on the study one looks at," and that "sometimes it's upwards of 69 percent." Cottrell also testified that trauma produces "disjointed memories" that are less linear than typical memories, including negative memories. In comparison, memories of incidents that occurred many times can blend together without many distinguishing characteristics to differentiate distinct events. Finally, Cottrell also testified that children can create false memories, but he maintained that these memories were usually the result of "coaching," they would "fade" more quickly than real memories, and they rarely produced a strong emotional response because they never really happened.

During closing arguments, the prosecutor repeatedly referred to Cottrell's testimony. For example, the prosecutor stated:

> You also have the testimony of Tom Cottrell. Tom Cottrell corroborated a lot of what [AE] and [NE], and also the other victims, told you, you know, really in terms of how and when children disclose acts of child sexual abuse. It's very common for them to keep the secret, to delay disclosure. He talked about the difference and—and some of this may be a lot of common sense, but others—like he talked about common misperceptions because if you don't have a lot of training in this area or work in this area or know people who have been sexually abused, some things might seem unusual, such as, you know, disclosing.

The prosecutor also discussed at length how the testimony of NE, AE, and defendant's nieces compared to Cottrell's expert testimony on child sexual abuse and misconceptions regarding sexual abuse, including specifically topics like (1) delayed disclosure, (2) self-harming behavior in victims of sexual abuse, (3) how memories are stored, (4) traumatic memories and trigger events, (5) the level of detail in reports of sexual abuse, (6) false memories and coaching, and (7) grooming of sexual abuse victims. The prosecutor additionally characterized defendant's conduct at issue in this case as "evil," compared it to murder, and stated that it "doesn't get much worse" than what defendant did in sexually abusing children who trusted him. Defense counsel did not object to those comments.

During defense counsel's closing argument, she argued that AE and NE were not credible witnesses because they did not disclose the alleged sexual abuse earlier and the events happened so long ago that their memories were not reliable. Defense counsel also addressed AE's emotional reaction addressed earlier. She admitted that AE's testimony was "very emotional" and contrasted it with information about AE's initial disclosure to Children's Protective Services in which AE was "calm, normal." Defense counsel argued that this discrepancy established that AE was not a credible witness.

During rebuttal, the prosecutor argued that the jury should believe the testimony of AE and NE:

> And I submit to you in this case that there has been no evidence of any motive to lie because [defense counsel] said to you in her closing maybe it didn't happen at all. Okay, consider that, talk about that in your deliberations. Maybe it didn't happen at all, then why in the heck are they saying it happened? There's been no evidence they have any motive to lie here. They didn't willingly run to the police to try and get the defendant in trouble. All of this came about because AE was specifically asked about it. And throughout this entire week, there has been no evidence showing why they would have any motive to lie about it.
>
> They have nothing to gain from reporting these sexual assaults. Defendant has not been in their lives for a while. They don't get money from this. But what happens instead? I mean, they have to go through this again. They have to relive it. They open themselves up to harsh questioning by everybody, by myself, by the defense attorney, by police, by therapists, by their families. So I ask you that, when considering whether they have any motive to lie, why would they make it up, unless it happened? There's no evidence to the contrary that they would have any motive to lie in this case.
>
> What do they have to gain by doing this? Nothing. And what do they have to lose? Being revictimized again.

At this point, defense counsel interjected with an objection that the prosecutor's revictimization argument was improper. The trial court overruled the objection. The prosecutor then continued:

> How is it revictimization? I'm sure you can imagine. I mean, having to come in here and having to see the defendant, having to relive it in front of him,

having to relive it in front of all you talking about these sexual activities that they clearly never wanted to talk about. They may have kept the secret forever or for a lot longer except for how things played out in this case with [Children's Protective Services] getting involved, the police being told. How is it not revictimization to come in and have to do all this again, reliving the embarrassment and the shame and the emotions and opening themselves up to questioning and thinking they won't be believed.

Defense counsel again objected. Although defense counsel did not request a curative instruction, or propose any particular language for an instruction, the trial court contemporaneously instructed the jury as follows:

You have to judge credibility using the typical tools you use to judge that. Ladies and gentlemen, the term "victim," I guess I'll just—we use that term because it's a term that we use when people are charged with a crime you have a defendant, you have a victim. I think we—I might be getting this confused with another recent case, but I think we talked about that a little bit. The term "victim" may be totally appropriate depending on what you determine at the end of the trial. But it's just—it's basically a way of identifying the participants in this trial right now and should not give you any particular suggestion that someone is a victim because they're being designated as a victim. Whether they're a victim or not depends on your findings at the end of the trial.

So in the course of final arguments, closing arguments like this, we give both attorneys some latitude in their suggestions to you about how you should view the evidence. But in the end, as I told you earlier, if either attorney says something that you believe is not supported by the evidence as fairly determined by you, you go by your recollection. I'll leave it at that.

Following the trial court's instruction, the prosecutor finished her rebuttal argument without any additional mention of revictimization. The prosecutor did, however, utilize a PowerPoint presentation during her closing argument. One of the slides in that presentation focused on revictimization:

## Re-victimization

Having to see Defendant
Reliving the assault—in front of Defendant!
Talking about it in open courtroom
Embarrassment
Shame
Opening themselves up to harsh questioning
Thinking they won't be believed

Trial counsel specifically objected to that slide as well.

After closing arguments concluded, the trial judge instructed the jurors. In relevant part, the trial judge instructed the jurors that they "must not let sympathy or prejudice influence [their] decision." The trial judge additionally instructed the jurors to consider Cottrell's expert opinion, but stressed that they were not required to accept Cottrell's opinion as fact. The trial judge gave standard jury instructions about the jurors' roles as the fact-finders in this case and that statements by the trial judge and the attorneys were not evidence. After deliberating for a few hours, the jurors returned a verdict finding defendant not guilty of Count I (CSC-I for sexually abusing AE), but guilty of Count II (CSC-I for sexually abusing NE).

In preparation for defendant's sentencing, the Department of Corrections prepared a presentence investigation report. The report noted that defendant was acquitted of Count I and found guilty of Count II. The description of defendant's offense addressed the allegations of AE and NE as well as the process that led to their disclosures to law enforcement. That portion of the report, however, did not specify that defendant was acquitted of the charge arising from AE's allegations. The report also asserted that defendant was subject to lifetime electronic monitoring under MCL 750.520n. The trial court and the attorneys did not address lifetime electronic monitoring at sentencing, but the judgment of sentence ordered it as part of defendant's sentence.

Defendant then filed an appeal with this Court. About two months after filing his brief on appeal, however, defendant filed a motion to remand with this Court, asking for a *Ginther*[1] hearing to further develop the record in support his claim that his trial counsel was ineffective. Defendant attached two affidavits to his motion. We note that, although not part of the lower court record, because defendant filed a timely motion to remand for a *Ginther* hearing, we consider the affidavits he provided on appeal for purposes of determining whether a remand for further factual development is warranted. See *People v Moore*, 493 Mich 933 (2013). The first affidavit was from defendant's appellate counsel. This affidavit asserted that trial counsel "asked around" about an expert witness to call at trial, but that trial counsel "Was not able to get the name of an expert." Accordingly, trial counsel "did not consult an expert" in this case. The second affidavit was from Dr. David Thompson, Ph.D., a clinical and forensic psychologist.

According to Dr. Thompson, half of child-sexual-assault disclosures are delayed. Dr. Thompson additionally averred that "traumatic memories are generally more fully and completely recollected than non-traumatic memories." He also addressed the creation of false memories. According to Dr. Thompson, there is ample research that children can form false memories "without deliberate coaching by an adult." He averred that "source misattribution errors occur on their own without any prompting" as a result of overhearing conversations, improper questioning about abuse, and unspecified "psychotherapeutic techniques that are used to treat children that have experienced trauma."

Dr. Thompson additionally averred that he was not aware of any "credible evidence that false memories fade more quickly than other memories." Finally, Dr. Thompson also addressed "co-witness conformity," a subject not mentioned at all during trial. According to Dr. Thompson, cowitness conformity "is the process by which individuals who witnessed an event may be

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

influenced by co-witnesses. When two individuals talk about their individual experiences of a similar event, the conversation may result in changes to one or both individuals' memories." Dr. Thompson's affidavit specifically addressed a cowitness-conformity study demonstrating its effect on young children and preteens.

This Court denied defendant's motion to remand "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar." *People v Montez*, unpublished order of the Court of Appeals, entered May 17, 2021 (Docket No. 353119). Defendant then filed a renewed motion to remand shortly before oral argument in this case.

## II. ANALYSIS

## A. INEFFECTIVE ASSISTANCE

Defendant first argues that his trial attorney provided ineffective assistance by failing to consult and call an expert on child sexual abuse and false memories. Defendant requests a new trial or, alternatively, a remand for a *Ginther* hearing. Because there has not been a *Ginther* hearing in this case "our review is limited to the facts on the record." *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008).

"To establish ineffective assistance of counsel, defendant must show (1) that defense counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's errors, a different outcome would have resulted." *People v Jackson*, 292 Mich App 583, 600-601; 808 NW2d 541 (2011). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

In this case, although defendant's offer of proof may have potentially warranted factual development on the adequacy of counsel's performance, see MCR 7.211(C)(1)(a), we conclude that defendant is not entitled to a new trial, and that a remand for a *Ginther* hearing is unnecessary, because it is clear that defendant cannot establish prejudice from counsel's failure to consult or call an independent expert in child sexual abuse and false memories. See *Strickland v Washington*, 466 US 668, 697; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

In particular, with regard to establishing prejudice, a defendant must show that, "but for counsel's deficient performance, there is a reasonable probability that the outcome of the defendant's trial would have been different." *People v Ackley*, 497 Mich 381, 394; 870 NW2d 858 (2015) (cleaned up). Under this standard, a defendant does not have to show that the evidence would have ensured acquittal, *id.* at 397, nor must a defendant show that counsel's "failure more likely than not altered the outcome," *Harrington v Richter*, 562 US 86, 111-112; 131 S Ct 770;

178 L Ed 2d 624 (2011) (quotation marks and citation omitted). Nevertheless, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id*. at 112. When "there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *People v Trakhtenberg*, 493 Mich 38, 56; 826 NW2d 136 (2012) (quotation marks and citation omitted).

On the issue of prejudice, defendant relies on the affidavit of Dr. Thompson to establish that, but for trial counsel's failure to consult an expert and offer independent expert testimony, there was a reasonable probability of a different outcome. In this regard, defendant maintains that Dr. Thompson could have (1) rebutted expert testimony from Cottrell by identifying contradictory research, and (2) offered additional testimony on false memories, including specifically information on source-misattribution error and cowitness conformity. Contrary to defendant's arguments, his ineffective-assistance claim fails because the proposed testimony from Dr. Thompson does not establish a reasonable probability of a different outcome.

First, defendant maintains that Cottrell inaccurately testified that upwards of 69% of child-sexual-abuse victims delay their disclosure when, according to Dr. Thompson, only half of disclosures are delayed and approximately half of all disclosures occur "close in time" to the alleged abuse. In actuality, Cottrell testified that "half" or "more than half" of abuse disclosures are delayed. He asserted that the percentage varies, depending "on the study one looks at," and that "sometimes it's upwards of 69 percent." In other words, Cottrell acknowledged there were different studies on the topic of delayed disclosure, and he even testified that "half" of the disclosures are delayed. His testimony is not materially inconsistent with Dr. Thompson's view on the topic. Furthermore, in his affidavit, Dr. Thompson specifically relied on a study published in 2020, which was *after* the trial in the current case, making it hard to see how this testimony could have been presented or how Cottrell could be challenged for not knowing of a study that did not exist when he testified. Additionally, and perhaps most importantly, the basic point of Cottrell's testimony is that, contrary to popular perception, not all children immediately report abuse and in fact many children delay reporting. This is true whether the percentage of delayed reports is 50% or 69%. Dr. Thompson's testimony on this topic would not alter the outcome of trial.

Second, Cottrell testified that trauma produces "disjointed memories" that are less linear than typical memories, including negative memories. According to Dr. Thompson, this is inaccurate, and in fact, the opposite is true. That is, according to Dr. Thompson, "traumatic memories are generally more fully and completely recollected than non-traumatic memories." Although Dr. Thompson's testimony on this point would clearly contradict Cottrell's testimony on the "disjointed" nature of traumatic memories, a contradiction on this point is not reasonably likely to alter the outcome. Fairly considered, Cottrell's testimony on traumatic memories—which focused extensively on "triggers" that are likely to bring back the traumatic memories—was offered to explain *AE*'s purported incomplete memory of events, why she may have previously blocked out the abuse, and her sudden recall of the abuse during an encounter with her boyfriend. Indeed, the prosecutor used Cottrell's testimony on trauma during closing argument to argue that *AE* "did store [the memory] as a traumatic memory." Because AE purportedly experienced terror during a one-time incident of sexual assault, the prosecutor asserted that she stored the memory as a traumatic memory, she essentially blocked the memory, and she later recalled the incident when

presented with a "trigger" while with her boyfriend. In this context, Dr. Thompson's proposed testimony on traumatic memory would clearly have been relevant to AE's disjointed memories of abuse. But the jury found defendant not guilty of the charge related to AE.

In comparison, Cottrell's traumatic-memory testimony had little or no relation to NE. NE did not describe triggers, blocked memories, sudden recall, or anything indicative of the traumatic-type memory that Cottrell described. And the prosecutor did not argue that NE's memories were affected by trauma. To the contrary, the prosecutor contrasted AE's one-time traumatic memory with a situation—more akin to NE's—in which "something is more frequent, happening regularly, often, on a daily or weekly basis," such that it may become "more normal, wrong, of course, but more normal, as part of life." Indeed, although acknowledging that NE's memories of abuse were not complete in terms of detail or every single act that happened, the prosecutor did *not* attribute this to trauma, but instead asserted that NE could not remember every detail because it happened on a regular basis and the events blended together. Cottrell offered testimony on how memories of repeated events can become blurred, particularly for children who do not "use the same markers" as adults in terms of time and place to organize their thoughts. He noted that it is not uncommon for children to "confuse multiple occurrences as a similar sort of event." But this testimony on multiple occurrences blurring in a child's mind had nothing to do with Cottrell's testimony on trauma, and Dr. Thompson's proposed testimony on traumatic memory would be irrelevant to the charge related to NE. In short, Cottrell's testimony on trauma did not relate to NE, and to the extent Dr. Thompson could have challenged Cottrell's testimony as related to AE's traumatic memories, it is immaterial at this juncture because the jury found defendant not guilty of the conduct related to AE. Consequently, the dispute about the formation of traumatic memories does not establish a reasonable probability of a different outcome.

Third, defendant maintains that Dr. Thompson could have contradicted Cottrell's testimony on the formation of false memories. In this regard, during cross-examination, Cottrell testified that the creation of false memories is possible particularly in young children, but he also testified that it required a "deliberate process," such as "coaching," and that it was not something that would "occur on its own." In contrast, in his affidavit, Dr. Thompson stated that there is ample research that children can form false memories "without deliberate coaching by an adult." He averred that "source misattribution errors occur on their own without any prompting" as a result of things like "overhearing other people's conversations" or "as a result of participating in therapeutic treatment." He also stated that he is "aware of no credible evidence that false memories fade more quickly than other memories."

Although Dr. Thompson could have contradicted Cottrell's assertion that false memories require a deliberate process, such as coaching, failure to present such testimony—and to provide additional testimony on source misattribution—did not affect the outcome of trial. To be admissible, under MRE 702, expert testimony needs to be both relevant and reliable. *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012) (opinion by KELLY, J.). "[E]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. at 121 (quotation marks and citation omitted). See also *People v Unger*, 278 Mich App 210, 249; 749 NW2d 272 (2008). For example, in the context of child-sexual abuse, expert testimony may be offered for the purpose of explaining a specific behavior that the jury might otherwise construe as inconsistent with abuse or to rebut attacks on credibility. *People v Peterson*, 450 Mich 349, 372; 537 NW2d 857 (1995). But this is dependent on the underlying facts of the particular case in

-8-

question.  See *id*.  That is, "*if the facts of a particular case* show that the victim delayed reporting the abuse, recanted the allegations, kept the abuse secretive, or was accommodating to the abuse, then testimony about that particular characteristic . . . would be admissible to dispel any myths the jury may hold concerning that behavior."  *Id*. (quotation marks and citation omitted; emphasis added).

As applied in this case, Dr. Thompson's proposed testimony—that false memories can be created in the absence of deliberate coaching by, for example, overhearing a conversation, repeated questioning, or participating in therapy—is not particularly relevant because there is no underlying factual foundation to support that NE (or AE) may have formed false memories through source misattribution as described by Dr. Thompson.  For example, there is no evidence that (1) NE or AE overheard any conversation about defendant or his conduct with his nieces, (2) they were subjected to "repeated questioning" involving improper techniques or a biased interviewer, or (3) they engaged in repeated conversations about events that did not occur.  In fact, AE and NE both expressly denied knowing any of the specific allegations of the abuse that defendant perpetrated on his nieces.  And the overwhelming and undisputed testimony—from their mother and defendant's nieces—was that the nature of the allegations by defendant's nieces against defendant were *never* discussed with NE or AE.  At most, NE and AE were asked—without any discussion of details—as children whether anything inappropriate happened with defendant, and they said no. Nothing in Dr. Thompson's description of source misattribution supports that this sort of brief and isolated questioning would or could result in the formation of false memories.  Similarly, nothing in the record suggests that NE's therapy would or could have caused false memories.  On this record, Dr. Thompson's testimony on source misattribution is, at most, minimally relevant, and it appears highly improbable that such testimony would have affected the outcome of the proceedings.

In the context of false memories, Dr. Thompson also asserted, in comparison to Cottrell's testimony that false memories fade more quickly than other memories, that he was not aware of any credible evidence that false memories fade more quickly than other memories.  Dr. Thompson does not, however, state one way or the other whether false memories fade more quickly, last longer, or otherwise differ from true memories in terms of how long they last.  Unlike with his other opinions, Dr. Thompson cites no articles or other sources related to how long false memories last in comparison to other memories.  It appears that he is simply unaware of any research on this topic.  Dr. Thompson's assertion that he lacks awareness of a specific topic is not particularly helpful, and it does not create a reasonable probability of a different outcome.

Fourth and finally, defendant contends that Dr. Thompson could have offered testimony on "co-witness conformity," a subject not mentioned at all during trial.  Considering Dr. Thompson's affidavit and the evidence in this case, Dr. Thompson's potential testimony on cowitness conformity is not particularly relevant on the facts of this case, and such testimony would not create a reasonable probability of a different outcome.  The testimony at trial was that NE and AE did not discuss their abuse by defendant until AE was 17 years old, at which time NE was already an adult.  Although Dr. Thompson vaguely asserted in his affidavit that cowitness conformity has been "well studied" in children *and* adults, the only detailed information he provided related to children under the age of 12, and he failed to explain how—or to what degree—it may apply to individuals over the age of 12.  Moreover, Dr. Thompson discussed cowitness conformity in the context of altering details of memories when children were shown "slightly

different" video clips of *the same event*. NE and AE never claimed to have participated in the same event. They testified that they were separately abused by defendant. Dr. Thompson failed to explain how, if at all, cowitness conformity applies to individuals discussing different events.

Lastly, it should be noted that NE and AE both disclosed their allegations of defendant's abuse to other people before discussing them with each other. Even if cowitness conformity could have conceivably altered the details of their memories, this charge of recent fabrication—albeit unconscious fabrication—is rebutted by their prior identifications of defendant. See MRE 801(d)(1)(B). Overall, Dr. Thompson's potential testimony on the topic of cowitness conformity has little relevance to the facts of this case, and it does not appear reasonably probable that this marginally probative evidence would have affected the outcome of trial.

In sum, defendant has not established that he was denied the effective assistance of counsel or that a remand for a *Ginther* hearing is warranted on the facts of this case.

## B. PROSECUTORIAL MISCONDUCT

Defendant also maintains on appeal that the prosecutor denied him a fair trial by engaging in three impermissible arguments. First, defendant contends that the prosecutor advanced an improper vouching argument by asserting that Cottrell's testimony "corroborated" the testimony from NE and AE. Second, defendant argues that the prosecutor appealed to the jury's sympathies and sense of civic duty by advancing a "revictimization" argument. Third, defendant asserts that the prosecutor denied him a fair trial by comparing CSC to murder and asserting that defendant's acts were "evil."

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant preserved his argument related to the prosecutor's corroboration statement by objecting and requesting a curative instruction. See *id*. To the extent that he sought a mistrial on the basis of the prosecutor's revictimization argument, his request for a mistrial is preserved. See *People v Haynes*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 350125) (2021); slip op at 7. But to the extent defendant now contends that alternative relief, such as a curative instruction, was warranted based on the prosecutor's revictimization argument, his argument is unpreserved because he failed to make such a request in the trial court. See *Bennett*, 290 Mich App at 475. Likewise, to the extent defendant challenges the prosecution's assertions that defendant's conduct was "evil" or worse than murder, defendant failed to object and request a curative instruction in the trial court, meaning that his argument in this regard is unpreserved. See *id*.

Preserved claims of prosecutorial misconduct are reviewed de novo by this Court to determine whether the defendant was denied a fair and impartial trial. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). This Court reviews a trial court's denial of a motion for a mistrial for an abuse of discretion. *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes." *Id*. Unpreserved issues are reviewed for plain error. *People v Cain*, 498 Mich 108, 116; 869 NW2d 829 (2015).

To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (cleaned up).]

"A 'clear or obvious' error under the second prong is one that is not 'subject to reasonable dispute.' " *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted).

"When reviewing a claim of prosecutorial misconduct, this Court must examine the pertinent portion of the record and evaluate a prosecutor's remarks in context." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 513 (2003). A prosecutor's comments must be read as a whole, and the propriety of the prosecutor's remarks depend on the particular facts of the case, the defendant's arguments, and the evidence admitted at trial. *Id.* "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich App at 236 (citations omitted).

## 1. VOUCHING

Defendant first contends that the prosecutor impermissibly used Cottrell's testimony to bolster the credibility of NE and AE. When discussing witness credibility, a prosecutor may not vouch for a witness by implying that the prosecutor has some special knowledge of a witness's credibility. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). The prosecutor, however, is free to comment on witness credibility and "to argue from the evidence and its reasonable inferences in support of a witness's credibility." *Bennett*, 290 Mich App at 478.

In this case, the prosecutor said nothing to suggest any personal knowledge of credibility. Instead, in the portion of the prosecutor's argument challenged by defendant, the prosecutor asserted that Cottrell's testimony "corroborated" the testimony given by NE, AE, and defendant's nieces. Defendant focuses on the prosecutor's statement that "Cottrell corroborated a lot of what [AE] and [NE], and also the other victims, told you, you know, really in terms of how and when children disclose acts of child sexual abuse." When reviewed as a whole, the prosecutor's closing argument addressed at length how the testimony of NE, AE, and defendant's nieces compared to Cottrell's expert testimony on child sexual abuse and misconceptions regarding sexual abuse, including topics like delayed disclosure and explanations regarding memories of traumatic events as well as repeated events. The prosecutor also addressed the level of detail in reports of sexual abuse, false memories and coaching, and grooming of sexual abuse victims. Cottrell offered testimony on the various topics discussed, meaning that there was an evidentiary basis for the prosecutor's argument that the victims' behaviors and any gaps in their memories were consistent

-11-

with Cottrell's testimony on the behaviors and memories of victims of child sexual abuse. See *Unger*, 278 Mich App at 236.

Nevertheless, defendant maintains that the prosecutor's argument was improper because it would be impermissible for Cottrell to vouch for the victims' credibility, and it should, therefore, be impermissible to use Cottrell's testimony to bolster the victims' credibility. In making this argument, defendant relies on *People v Thorpe*, 504 Mich 230, 259; 934 NW2d 693 (2019), for the proposition that an expert in child sexual abuse cannot vouch for a victim's credibility by, for example, testifying about the percentage of children who lie about sexual abuse. See also *People v McFarlane*, 325 Mich App 507, 521-522; 926 NW2d 339 (2018). To be clear, in relying on *Thorpe*, defendant does not contend that *Cottrell* impermissibly vouched for the victims or otherwise offered improper testimony on credibility or defendant's guilt. Instead, defendant maintains that *the prosecutor* misused Cottrell's otherwise proper testimony during closing. Defendant's argument lacks merit.

It is well recognized that, as occurred in this case, "the prosecution may present evidence, if relevant and helpful, to generally explain the common postincident behavior of children who are victims of sexual abuse." *Peterson*, 450 Mich at 373. Moreover, "[t]he prosecution may, in commenting on the evidence adduced at trial, argue the reasonable inferences drawn from the expert's testimony and compare the expert testimony to the facts of the case." *Id*. This is precisely what occurred in this case. When the prosecutor's argument about Cottrell is read as a whole and in context, the prosecutor permissibly compared Cottrell's testimony to the facts of this case to explain the delayed disclosure of abuse, matters related to memory and "triggering" events, and other issues relevant to the behaviors of NE, AE, and defendant's nieces. This was proper under *Peterson*.

Rather than consider the prosecutor's argument as a whole, defendant reads the word "corroborated" in isolation and asserts that the use of the word "corroborate" was an attempt to use Cottrell's testimony for improper vouching purposes. But even if use of the term "corroborated" was inartful, this isolated comment in an otherwise proper argument about Cottrell's testimony does not warrant reversal of defendant's conviction. See *People v Brownridge (On Remand)*, 237 Mich App 210, 216; 602 NW2d 584 (1999). Moreover, although the trial court denied defendant's request for a specific curative instruction, the trial court properly instructed the jurors that they alone must decide the facts of the case and witness credibility, they must decide the case on the evidence properly admitted, the lawyers' statements and arguments were not evidence, and the jurors did not have to believe an expert's opinions. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). On the whole, there has been no assertion that Cottrell's testimony actually constituted impermissible vouching testimony under *Thorpe*; the prosecutor properly compared the behavior of NE and AE to Cottrell's testimony as allowed under *Peterson*; and a properly instructed jury considered the evidence against defendant. Defendant was not denied a fair and impartial trial. See *Mann*, 288 Mich App at 119.

## 2. REVICTIMIZATION

Defendant also argues that the prosecutor improperly appealed to the jurors' sympathies and sense of civic duty by arguing that AE and NE faced "revictimization" as a result of having to

appear at trial. According to defendant, the trial court abused its discretion by denying his motion for a mistrial or, at a minimum, the trial court should have sua sponte taken some action to address the issue. The prosecutor's revictimization argument was made during rebuttal, in the context of the prosecutor's more general assertion that NE and AE had no reason to lie. As described earlier, the prosecutor repeatedly stated that AE and NE were being revictimized by testifying at trial and that revictimization weighed against any suggestion that they were not testifying truthfully. The prosecutor also had a PowerPoint slide on the subject. Trial counsel objected, and the trial judge gave a contemporaneous instruction to the jury about the use of the word "victim" during the trial.

Considering the prosecutor's arguments as a whole and in context, we initially note that the prosecutor generally couched her revictimization argument in the context of a credibility discussion and an assertion that NE and AE had nothing to gain and no reason to lie by making allegations against defendant. Prosecutors are "generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich App at 236. And a prosecutor may comment on witness credibility and argue, based on the evidence, that a witness had no motive to lie. *Thomas*, 260 Mich App at 455-456.

That said, a prosecutor should not "invite[] jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *Lane*, 308 Mich App at 66. In this case in particular, the prosecutor exceeded the bounds of proper argument by arguing that NE and AE faced revictimization as a result of the trial and by asserting that they would be revictimized if they were not believed. See *Unger*, 278 Mich App at 237. Such an argument constituted an improper appeal to the jurors' sympathies. See *id*. Indeed, as framed by the prosecutor in this case, NE and AE were "revictimized" by defendant's exercise of his constitutional right to a trial, including his right to confront the witnesses against him. That is, the prosecutor argued that NE and AE had been revictimized because they came to court, saw defendant, and answered questions before the jury. As argued by the prosecutor, the jury itself was part of the problem because NE and AE faced the risk that "they won't be believed" and that too would constitute revictimization. Certainly, appearing at trial to testify, particularly about a painful topic like sexual abuse, can be a difficult experience. But it is nevertheless true that a jury's determination of guilt must be based on the evidence, not sympathy. These kinds of revictimization arguments—asserting that victims should be believed because they have been revictimized by a trial or because failure to believe them would revictimize them—are improper attempts to arouse the jury's sympathies. See *id*.

Although the prosecutor's argument was improper, relief is not warranted on appeal. First, to the extent defendant sought a mistrial, and argues on appeal that a mistrial should have been granted, a mistrial was not warranted because revictimization arguments—while improper—can be addressed with a curative instruction. See *id*. Second, even though defendant did not request a curative instruction or propose any particular language for an instruction, the trial court sua sponte instructed the jury that the term "victim" may not be an appropriate description for the complainants in this case, making clear that NE and AE were not "victims" simply because they had made allegations and appeared in court. The trial court also specified that the jury decided issues of credibility and that the jury did not have to accept the prosecutor's arguments. Third, aside from this contemporaneous instruction on "victims" and issues of credibility, the trial court also provided standard jury instruction on assessing credibility, not letting sympathy influence the jury's verdict, and that the lawyers' arguments were not evidence. Jurors are presumed to follow their instructions, and these general instructions, particularly when coupled with the trial court's

more specific instruction on "victims," alleviated the prejudice to defendant. See *id*. Fourth, in concluding that the instructions were sufficient to cure any prejudice to defendant in this case, it again bears noting that the jury found defendant not guilty of the charge related to AE. Clearly, notwithstanding the prosecutor's improper revictimization argument, the jury understood its role in assessing credibility and had no qualms about disbelieving one of the alleged victims. On this record, the prosecutor's improper revictimization argument did not deny defendant a fair and an impartial trial. See *Mann*, 288 Mich App at 119. He is not entitled to relief on appeal.

### 3. NATURE OF THE OFFENSE

Defendant also argues that the prosecutor erred by (1) comparing child sexual abuse to murder, and (2) describing defendant's conduct as "evil" and noting that it "doesn't get much worse" than what defendant did in sexually abusing children who trusted him. Considered in context, the prosecutor's arguments in this regard were not improper. The prosecutor did not inject into trial issues that were broader than defendant's guilt or ask the jurors to suspend their judgment, but urged the jury to convict defendant because the evidence established that defendant was guilty of egregious acts. These arguments focused on the evidence were not improper. See *People v Hoffman*, 205 Mich App 1, 21; 518 NW2d 817 (1994). Further, although the prosecutor used "hard language," this was not improper during closing. See *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). Even assuming arguendo that there was error, defendant would not be entitled to relief on appeal because defendant failed to object and a timely objection and curative instruction could have alleviated any potential error. See *Unger*, 278 Mich App at 237.

### C. COURTROOM DISTURBANCE

Next, defendant argues that he was denied a fair trial when AE became emotional during her testimony. Defendant describes the incident as an "emotional breakdown," and he asserts that AE's "loved ones rushed to the witness stand to comfort her." Defendant failed to object in the trial court or request a curative instruction or other relief. Nevertheless, on appeal, defendant argues that the trial court should have sua sponte polled the jurors regarding their impartiality and issued a curative instruction related to AE's outburst. Defendant failed to raise this issue in the trial court, so it is unpreserved and reviewed for plain error. See *Jackson*, 292 Mich App at 592.

Factually, defendant's argument relates to a recess taking during AE's direct-examination testimony. While being asked about the incident of sexual abuse allegedly perpetrated by defendant, AE began to cry and the trial court ordered a recess. Following a short recess, trial reconvened and AE continued her testimony. Defendant made no objection during these events, and defendant did not request a curative instruction, a mistrial, or any other relief. This is the entirety of the incident as reflected in the original record that forms the basis for our review. See MCR 7.210(A).

Defendant has not established plain error in the trial court's decision to call a recess when AE became emotional during her testimony. "It is well established that the trial court has a duty to control trial proceedings in the courtroom and has wide discretion and power in fulfilling that duty." *People v Biddles*, 316 Mich App 148, 153; 896 NW2d 461 (2016). The trial court's authority to insist that a case is tried in a proper and orderly manner includes discretion in responding to outbursts in the courtroom. See *People v Inman*, 315 Mich 456, 473-474; 24 NW2d

176 (1946). Emotional reactions by victims and others have been described as a "natural" response to reliving events during trial, 99 ALR 6th 113, and depending on the facts of a case, evidence of a victim's "emotional state" may actually be relevant to evaluating a victim's credibility or the weight to give testimony by others who have described the victim's emotional state following a crime, see *People v Shorter*, 324 Mich App 529, 541; 922 NW2d 628 (2018). At that same time, there is a risk that "such emotional reactions may be unfair to the defendant, as the jury may convict the defendant not on the basis of actual evidence but on the basis of mere sympathy with the victims." 99 ALR 6th 113.

As one example of an emotional outburst and the trial court's response thereto, in *People v Gonzales*, 193 Mich App 263, 264-265; 483 NW2d 458 (1992), the victim had an "outburst" during cross-examination by defense counsel and exclaimed: "I have never slept with the scum and what happened to me is not right, and I'm through cooperating with you; do you understand me? He's an ass hole, murderer, and I don't care if I blew this case." The defendant moved for a mistrial or, in the alternative, for a curative instruction. *Id*. at 265. The trial court denied the mistrial but read a curative instruction to the jury, and this Court found no error on appeal. *Id*. at 265-266. Another example of a courtroom disturbance may be found in *People v Bauder*, 269 Mich App 174, 194-195; 712 NW2d 506 (2005), overruled in part on other grounds as recognized in *People v Burns*, 494 Mich 104, 112-113; 832 NW2d 738 (2013). That case involved a "courtroom outburst by the victim's brother," who yelled that the defendant had "killed his sister." *Id*. The defendant moved for a mistrial, which the trial court denied. *Id*. at 194. The trial court, however, took other steps to preserve defendant's right to a fair and impartial trial, which included asking the jurors if they could disregard the outburst and remain impartial as well as instructing the jury that the outburst was not evidence. *Id*. at 194-195.

In this case, in response to AE's crying on the witness stand and her request for her medication, the trial court promptly called a recess and removed the jury from the courtroom. Unlike in *Gonzalez* and *Bauder*, defendant did not object or move for a mistrial or request any other action, such as a curative instruction or questioning the jury. Yet, on appeal, defendant now claims that the trial court should have sua sponte undertaken such action. But in the cases on which he relies—e.g., *Gonzalez* and *Bauder*—the defendants objected to the outbursts and requested relief. Defendant cites no authority for the proposition that the trial court was required to sua sponte poll the jury or issue a curative instruction when AE became emotional on the stand. See generally *People v Rice*, 235 Mich App 429, 444; 597 NW2d 843 (1999).

Defendant also cites no authority for his assertion that the recess called by the trial court was categorically inadequate to address any potential prejudice. As noted, the trial court has wide discretion in controlling and maintaining order in the courtroom. See *Inman*, 315 Mich at 473-474; *Biddles*, 316 Mich App at 153. In this case, the trial court exercised that discretion by calling a recess and removing the jury from the courtroom when AE became emotional. The trial court was in the best position to assess AE's emotional demeanor and any potentially prejudicial effect on the jury. See generally *People v Albers*, 258 Mich App 578, 588; 672 NW2d 336 (2003); *People v Lee*, 212 Mich App 228, 251; 537 NW2d 233 (1995). By the same token, the trial court was in the best position to determine the appropriate response to AE's emotional testimony. In the absence of an objection by defendant or any other request for relief, defendant has not shown plain error in the trial court's decision to call a recess rather than sua sponte polling the jury and issuing a curative instruction.

In concluding that defendant has failed to show plain error, three additional points warrant mention. First, although the trial court did not issue a curative instruction during AE's testimony, the trial court did instruct the jurors that they "must not let sympathy or prejudice influence [their] decision." "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Abraham*, 256 Mich App at 279. Second, although defendant now contends that AE's outburst prejudiced him, at trial, defense counsel used AE's outburst to the defense's benefit during closing arguments, contrasting AE's "very emotional" testimony with her "calm, normal" demeanor when speaking with Children's Protective Services. Indeed, as defense counsel evidently recognized, depending on the facts, a witness's emotions may be relevant to assessing credibility, *Shorter*, 324 Mich App at 541, and outbursts may be just as likely to impugn credibility as to bolster it. Particularly in view of counsel's use of this incident to benefit the defense, and considering the record before this Court, defendant has not established that he was prejudiced by AE's outburst. See *People v Dixon-Bey*, 321 Mich App 490, 511; 909 NW2d 458 (2017). Third, the jury ultimately returned a verdict of not guilty with respect to the charge related to AE. That the jury returned a not-guilty verdict on this count is a very strong indication that the jury was not swayed in the prosecution's favor by AE's emotional outburst and that the incident did not affect the outcome of trial. For all these reasons, defendant has not shown plain error, and he is not entitled to relief on appeal.

Finally, we note that, on appeal, defendant attempts to expand the record by attaching an affidavit—from an intern with the public defender's office who attended defendant's trial—to his brief on appeal. This affidavit, however, was never presented in the lower court, and defendant may not now expand the record on appeal. See *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499 (1999). Indeed, defendant has made no effort to move for the expansion of the record on appeal or to seek an evidentiary hearing to develop a factual record on this issue. See *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Nevertheless, we have reviewed this affidavit, and even if this affidavit is considered, we would conclude that defendant is not entitled to relief on appeal.

## D. CUMULATIVE ERROR

Defendant also argues that the claims of error we have already discussed—even if insufficient to merit relief individually—entitle defendant to a new trial if considered cumulatively. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). "In making this determination, only actual errors are aggregated to determine their cumulative effect." *People v Bahoda*, 448 Mich 261, 293 n 64; 531 NW2d 659 (1995). In this case, as we have discussed, defendant's only claim of error with merit relates to the prosecutor's revictimization argument, which improperly appealed to the jurors' sympathies. And, as already discussed, this error did not, on its own, warrant a new trial. Given that there is only one actual error and that error does not warrant reversal, defendant has not shown that the cumulative effect of multiple errors warrants relief on appeal. See *Dobek*, 274 Mich App at 106.

## E. PRESENTENCE INVESTIGATION REPORT

Next, defendant challenges the information included in his presentence investigation report. Specifically, defendant asserts that information relating to AE's allegations—as recounted in the agent's description of events—should be stricken from the presentence investigation report because it relates to acquitted conduct and it is simply not relevant. Although defendant preserved this issue by raising it in his motion for remand filed with this Court, he did not raise this issue at sentencing. See MCR 6.429(C); *People v Lloyd*, 284 Mich App 703, 706 & n 1; 774 NW2d 347 (2009). Accordingly, we do not have a trial-court ruling to review. Thus, we must address this issue in the first instance akin to de novo review.

As noted by defendant, the agent's description of the offense in the presentence investigation report includes a summary of events related to AE as well as NE, specifically detailing AE's disclosures during the Children's-Protective-Services investigation, her allegations against defendant, and her disclosures to NE, which resulted in NE also coming forward to speak with authorities about defendant's abuse. The presentence investigation report also clearly states, however, that defendant was found not guilty of Count I—the charge related to AE.

Defendant is correct that "a sentencing court may not rely even in part on acquitted conduct when imposing a sentence for the defendant's conviction." *People v Stokes*, 333 Mich App 304, 310; 963 NW2d 643 (2020). It does not follow, however, that information about acquitted conduct cannot appear in a presentence investigation report. As explained by this Court:

> [A] sentencing court may review a [presentence investigation report] containing information on acquitted conduct without violating *Beck*[2] so long as the court does not rely on the acquitted conduct when sentencing the defendant. *Beck* supports this conclusion. In *Beck*, our Supreme Court remanded for resentencing because the sentencing court unquestionably "relied" on acquitted conduct for its sentencing decision. A sentencing court that reviews a [presentence investigation report] that merely contains information about acquitted conduct, however, does not necessarily rely on such information when sentencing a defendant. There must be some evidence in the record that the sentencing court relied on such information to warrant finding a *Beck* violation. Had the sentencing court specifically referenced acquitted offenses as part of its sentencing rationale, a *Beck* violation would be apparent. But when [presentence investigation reports] prepared by the Department of Corrections merely refer to an acquittal by a jury of offenses in a separate case, and the sentencing court does not refer to or expressly rely upon such acquitted offenses as part of its sentencing rationale, this Court cannot conclude that the sentencing court committed a *Beck* violation because such a conclusion would rest on speculation that acquitted conduct influenced the sentencing court's decision. [*Id*. at 311-312 (citation omitted).]

---

[2] *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

Under *Stokes*, information about AE need not be stricken from the presentence investigation report merely because it involves acquitted conduct. Defendant does not argue on appeal, and the record does not suggest, that the trial court relied on the information related to AE when sentencing defendant. Absent some indication that the trial court improperly relied on this information, defendant cannot show error related to acquitted conduct. See *id*.

Although acknowledging this Court's decision in *Stokes*, defendant asserts that *Stokes* is not dispositive of his arguments because *Stokes* did not address whether information related to acquitted conduct is relevant. Information that is irrelevant or inaccurate should not be included in the presentence investigation report. See *People v Waclawski*, 286 Mich App 634, 690; 780 NW2d 321 (2009). But it is also true that the scope of the presentence investigation report, as an information-gathering tool, is "necessarily broad." *Morales v Mich Parole Bd*, 260 Mich App 29, 45-46; 676 NW2d 221 (2003). Under MCR 6.425(A)(1)(b), the presentence investigation report must include "a complete description of the offense *and the circumstances surrounding it*." (Emphasis added). Information regarding the investigation of an offense forms part of the circumstances surrounding an offense, and such information is not excludable merely because the investigation also involved other crimes. That is, as detailed in the presentence investigation report, it was AE's allegations of abuse that prompted the involvement of Children's Protective Services and the police, and it was AE's disclosure to NE and the authorities' investigation into AE's allegations that prompted NE's own disclosures of the abuse that constitutes the basis for defendant's conviction. In this context, the investigation of AE's allegations—as the catalyst for and part of—the investigation of NE's complaint against defendant formed part of the circumstances surrounding the offense. This information was properly included in the broad scope of the presentence investigation report under MCR 6.425(A)(1)(b). Thus, defendant is not entitled to a remand to have information related to AE struck from the presentence investigation report. Having concluded that there was no error in the inclusion of this information in the presentence investigation report, we also conclude that any objection from trial counsel would have been futile and, therefore, cannot establish ineffective assistance of counsel. See *Thomas*, 260 Mich App at 457.

## F. LIFETIME ELECTRONIC MONITORING

Lastly, defendant argues that the trial court erred by subjecting defendant to lifetime electronic monitoring. According to defendant, the imposition of lifetime electronic monitoring in this case violates ex post facto prohibitions, it required fact-finding by the jury to determine the date of his offense, and it was improper because defendant was not given notice that he could be subject to lifetime electronic monitoring. The prosecutor agrees, conceding that NE's trial testimony does not definitively establish that the sexual abuse occurred before August 28, 2006, the effective date of 2006 PA 169 which enacted the lifetime-electronic-monitoring penalty. Defendant failed to raise this issue at the trial-court level and, therefore, it is unpreserved and reviewed for plain error. See *People v Earl*, 297 Mich App 104, 111; 822 NW2d 271 (2012), aff'd 495 Mich 33 (2014).

As already recognized by the Michigan Supreme Court, lifetime electronic monitoring is "an additional punishment and part of the sentence itself when required by the CSC–I or CSC–II statutes." *People v Cole*, 491 Mich 325, 336; 817 NW2d 497 (2012). As punishment, the addition of the lifetime electronic monitoring to the sentencing scheme for CSC-I constituted an increase

in punishment subject to ex post facto prohibitions. See *People v Wiley*, 324 Mich App 130, 153-154; 919 NW2d 802 (2018). NE testified that defendant repeatedly sexually abused NE between 2004 and 2008, but NE could not specify when any single instance of sexual abuse occurred. Thus, the prosecutor failed to establish that any instance of sexual abuse occurred before August 28, 2006. Thus, lifetime electronic monitoring would be an impermissible ex post facto punishment. This error was plain and it affected defendant's substantial rights. Accordingly, we remand with instructions to amend defendant's judgment of sentence to remove the lifetime-electronic-monitoring requirement. Having concluded that defendant is entitled to relief on ex-post-facto grounds, we find it unnecessary to address defendant's additional argument related to lifetime electronic monitoring.

## III. CONCLUSION

We affirm defendant's conviction and deny defendant's motion to remand. We remand to the trial court solely to correct the judgment of sentence to strike the imposition of lifetime electronic monitoring. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Brock A. Swartzle